**LASKO METAL PRODUCTS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Durable Electric Metal Factory, Ltd., et al., Defendant–Intervenors.**

**Court No. 92–01–00001.**

United States Court of International Trade.

Dec. 23, 1992.

McKenna & Cuneo, Lawrence J. Bogard and Peter Buck Feller, Washington, DC, for plaintiff.

Stuart Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, U.S. Dept. of Justice, Civ. Div., Jeffrey M. Telep, David Richardson, Atty.-Advisor, Office of the Deputy Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel, Washington, DC, for defendant.

Dorsey & Whitney, James Taylor, Jr. and Panagiotis C. Bayz, Washington, DC, for defendant-intervenors Polaray Indus. Corp., Polaray Indus. (Hong Kong) Corp., Ltd., Paragon Industries China, Inc., Wing Tat Elec. Mfg. Co., Ltd., Wing Tat Elec. Mfg. (Intern.) Co., Ltd., and China Miles Co., Ltd.

Dickstein, Shapiro & Morin, Arthur J. Lafave, III and Douglas N. Jacobson, Washington, DC, for defendant-intervenors

Durable Elec. Factory Ltd., Esteem Industries, Ltd., Holmes Products Corp. and Paragon Industries.

Pettit & Martin, John H. Korns, Washington, DC, for defendant-intervenors Shell Elec. Mfg. Co., Ltd., SMC Elec. Mfg. Co., and SMC Marketing Corp.

Willkie Farr & Gallagher, William J. Clinton, Washington, DC, for defendant-intervenor Wuxi Elec. Fan Factory, Ltd.

## OPINION

RESTANI, Judge:

Plaintiff, Lasko Metal Products ("Lasko"), is a major American manufacturer of oscillating and ceiling fans. Based on a petition filed by Lasko, the Department of Commerce, International Trade Administration ("ITA") began an antidumping investigation of Chinese fans on November 20, 1990. *Oscillating Fans and Ceiling Fans from the People's Republic of China*, 55 Fed.Reg. 49,320 (Dep't Comm.1990) (init. of antidumping duty investigations). ITA made its final affirmative determination of sales at less than fair value on October 18, 1991. *Oscillating Fans and Ceiling Fans from the People's Republic of China*, 56 Fed.Reg. 55,271 (Dep't Comm.1991) (final determ.) ("Fans").[1] ITA subsequently issued antidumping duty orders and an amended final determination, which calculated dumping margins to be zero to 0.79 percent for oscillating fans and zero to 2.47 percent for ceiling fans. *Oscillating Fans and Ceiling Fans from the People's Republic of China*, 56 Fed.Reg. 64,240, 64,-241 (Dep't Comm.1991) (amended final determ.).[2]

In reaching its decision, ITA relied on a "mix and match" methodology, to which Lasko objects. ITA first found that China was a nonmarket economy ("NME"). Because the administrative record contained

[1] ITA reached this determination after the International Trade Commission (ITC) had made a preliminary determination of injury, *Certain Electric Fans from the People's Republic of China*, USITC Pub. 2340, Inv. No. 731–TA–473 (Dec. 1990), and after ITA had made a preliminary determination of sales at less than fair value, *Oscillating Fans and Ceiling Fans from the Peo-*

*ple's Republic of China*, 56 Fed.Reg. 25,664 (Dep't Comm.1991) (prelim. determ.).

[2] ITC had previously reached a final determination of material injury in *Certain Electric Fans from the People's Republic of China*, USITC Pub. 2461, Inv. No. 731–TA–473 (Dec.1991).

insufficient information for normal statutory methods of calculation, ITA computed fair market value partly based on information from surrogate countries. Pakistan was chosen as the most comparable surrogate and India as an acceptable alternative. Instead of relying solely on surrogate country values, ITA also based its calculations on prices paid by Chinese manufacturers for raw materials imported from market economy countries. *Fans*, 56 Fed.Reg. at 55,273.

Plaintiff Lasko contends that ITA's decision to base its calculations on a combination of Chinese and surrogate country values violated the statutory mandate and should be reversed. Defendant ITA and defendant-intervenors, Chinese fan manufacturers, support the agency's decision below.

## STANDARD OF REVIEW

ITA's determination will be sustained if it is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988).

## DISCUSSION

### I. ITA's Mix and Match Methodology

■ The statute provides that where an antidumping investigation concerns an NME and there is insufficient information to calculate dumping margins by normal methods, Commerce should apply a factors of production approach using surrogate country values. 19 U.S.C. § 1677b(c)(1) (1988).[3] Surrogate values reflect the cost of producing goods in "one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." *Id.* § 1677b(c)(4).

Lasko's strict construction of the statute would require ITA to calculate all factors of production based on data from an appropriate market economy country selected as a surrogate. ITA and defendant-intervenors interpret the statute as giving ITA discretion to use surrogate country values combined with more accurate market-based values, such as the prices paid by NME manufacturers for raw materials purchased on an open market.

A recent decision in this court has already addressed this issue. *Tianjin Mach. Import & Export Corp. v. United States*, 16 CIT ——, 806 F.Supp. 1008 (1992). The court specifically found "that Commerce may use evidence of prices paid by the nonmarket economy country to market-economy suppliers in combination with surrogate country information when valuing factors of production." *Id.* at ——, 806 F.Supp. at 1018. Lasko attempts to distinguish *Tianjin* on the ground that it was decided under the "best information available" provision of 19 U.S.C. § 1677e(c) (1988), which applies where a party has failed to submit adequate data to Commerce. Although *Tianjin* contains some distinguishing features, its alternative reasoning based on a textual analysis of the statute is fully applicable to the case at hand. *See* 16 CIT at ——, 806 F.Supp. at 1016–19.

■ Furthermore, legislative purpose and past practice by Commerce support this court's prior holding in *Tianjin*. The purpose of the antidumping statute, according to the Federal Circuit, is "determining current margins as accurately as possible." *Rhone Poulenc, Inc. v. United States*, 8 Fed.Cir. (T) ——, ——, 899 F.2d 1185, 1191 (1990). With respect to NME goods, the statute's goal is to determine what the cost of producing such goods would be in a

---

**3.** The statute directs Commerce to apply factors of production analysis only if "available information does not permit the foreign market value of the merchandise to be determined under subsection (a)." 19 U.S.C. § 1677b(c)(1)(B). Subsection (a) sets forth two bases for calculating foreign market value: first, the price of sale in the home country and second, the price of sale in third countries, i.e., countries other than

the United States, to which the goods have been exported. *Id.* § 1677b(a)(1). Valuation based on third country sales is appropriate only when home country sales form an inadequate basis of comparison. *Id.* § 1677b(a)(1)(B). Commerce did not apply either of these normal methods of valuation in this case. *Fans*, 56 Fed.Reg. at 55,273.

market economy. *Tianjin,* 16 CIT at ——, 806 F.Supp. at 1018.

The cost for raw materials from a market economy supplier, paid in convertible currencies, provides Commerce with the closest approximation of the cost of producing the goods in a market economy country. Only if the combination of surrogate values and market-based values would somehow produce less accurate results would Commerce's use of this information be unreasonable. There is no such evidence in the record.[4] Accordingly, the court agrees with the conclusion in *Tianjin* that Commerce's use of this market-based information promotes the statute's goal of accuracy. *Id.*

Commerce's use of the mix and match methodology is also consistent with past administrative decisions. As stated in one prior determination, "[i]t is the Department's practice to value factor-of-production inputs at actual acquisition prices if it can be established that those inputs are purchased from a market economy country in freely convertible currency." *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the Republic of Hungary,* 56 Fed.Reg. 41,819, 41,820

(Dep't Comm.1991) (final admin. review); *see also Sparklers from the People's Republic of China,* 56 Fed.Reg. 20,588, 20,-588 (Dep't Comm.1991) (final determ.).[5] The Court of International Trade upheld this practice in *Tianjin,* affirming Commerce's decision to "value[ ] raw steel inputs based upon the price that the PRC actually paid to Japan, a market economy country." 16 CIT at ——, 806 F.Supp. at 1017–18.

ITA developed the mix and match approach because, in its view, the statute does not directly address "the situation in which an NME producer imports some inputs from market economies." *Fans,* 56 Fed.Reg. at 55,274.[6] The *Tianjin* decision, in accordance with Commerce's interpretation, asserts that "[n]othing in the [statute] or its legislative history mandates that Commerce must derive foreign market values exclusively from either actual prices paid by the nonmarket economy, or from surrogate-based values." 16 CIT at ——, 806 F.Supp. at 1018.[7]

While an alternative interpretation of the statute requiring that ITA abandon all actual prices once it is forced to resort to

---

**4.** Lasko makes an unsuccessful attempt to argue that a combination of overhead costs of Pakistani manufacturers and the actual raw material costs of Chinese producers leads to an absurdly low result. Lasko complains that Pakistan is a "high material cost/low overhead cost producer of fans," whereas China is the opposite. Plaintiff's Memorandum in Support of Judgment on the Agency Record, at 36–37. There is no evidence that the mix-and-match methodology consistently combines the lowest values of the surrogate country and the country under investigation. Costs of production in a surrogate country will never perfectly approximate what the costs in an NME would be in an open market situation. Any inaccuracies in the mix-and-match approach likely stem from surrogate values analysis, not Commerce's attempt to improve upon it.

**5.** *Accord Chrome–Plated Lug Nuts from the People's Republic of China,* 56 Fed.Reg. 46,153, 46,-154 (Dep't Comm.1991) (final determ.) (using market-driven prices because such use "best comports with what we believe the statute is directing us to do"). Commerce later reversed its position, declining to apply the mix and match methodology to raw materials purchased from what later turned out to be an NME sup-

plier. *Chrome–Plated Lug Nuts from the People's Republic of China,* 57 Fed.Reg. 15,052, 15,-053 (Dep't Comm.1992) (amended final determ.).

**6.** The court was intrigued but not entirely persuaded by defendant-intervenors' argument that the statute specifically envisions mix and match methodology because it allows the combination of different surrogate values. In past cases, Commerce has calculated foreign market value based on the factors of production of two different surrogate countries. *See, e.g., Sparklers,* 56 Fed.Reg. at 20,588 (India and the Philippines). Nevertheless, the clear statutory mandate to use values from "one or more market economy countries," 19 U.S.C. § 1677b(c)(4), does not exist with respect to the use of market-driven values in combination with surrogate data.

**7.** A recent report of the House of Representatives' Committee on Ways and Means acknowledges the existence of Commerce's mix and match methodology, and expresses disapproval of it. H.R.Rep. No. 607, 102d Cong., 2d Sess. 168–69 (1992) (report on trade bill). Because the bill discussed in the report never reached the floor, the court declines to view this report as evidence of legislative intent.

surrogate country values might have been possible, as indicated, such an interpretation would conflict with the overall statutory purpose. Accordingly, the court perceives insufficient reason to deviate from *Tianjin's* acceptance of ITA's approach.

Lasko's final argument against the mix and match methodology is that such an approach impermissibly treats the market economy countries that supply the non-market producers as surrogate countries. This argument, also put forward by the losing party in *Tianjin,* "must be dismissed out of hand." *Id.* at ——, 806 F.Supp. at 1017. As Commerce stated in this case, "these input values are not surrogate values. They are the actual market based prices incurred by the respondents in producing the subject merchandise." *Fans,* 56 Fed.Reg. at 55,275.

## II. ITA's Calculation of General Expenses and Profit

■ The statute provides that when Commerce bases its calculations on the factors of production, it should add "an amount for general expenses and profit." 19 U.S.C. § 1677b(c)(1). The amount for general expenses must not be less than ten percent of the cost of raw materials and the amount for profit must not be less than eight percent of general expenses plus cost of materials. 19 U.S.C. § 1677b(e)(1)(B).

In this case, Commerce applied the statutory minimum of ten percent for general expenses. To determine profit, it multiplied the Pakistani profit rate by the cost base, which included surrogate values and actual costs of materials bought in market economies. *Fans,* 56 Fed.Reg. at 55,273. Lasko argues that a "rate" does not equal an "amount" as stated in the statute. While it is true that a rate does not equal an "amount," multiplying a rate by a cost base produces an amount. Congress implicitly recognized this by referring to minimum percentage rates to determine the amounts for profit and general expenses. *See* 19 U.S.C. § 1677b(e)(1)(B). Therefore, Lasko's argument is unpersuasive.

Lasko's contention that Commerce violated the statute by using a cost base derived from surrogate values combined with actual market-driven prices merely repeats Lasko's argument as to the mix and match methodology. Commerce acted reasonably in multiplying a profit rate by a cost base to determine an amount of profit.

Based on the foregoing reasons, Commerce's determination in *Oscillating Fans and Ceiling Fans from the People's Republic of China,* 56 Fed.Reg. 55,271, is sustained.