**Slip Op. 01-138**

# United States Court of International Trade

<table>
<tr><td>

RHODIA, INC.,
      Plaintiff,

      v.

UNITED STATES,
      Defendant

      and

JILIN PHARMACEUTICAL CO., LTD.;
SHANDONG XINHUA PHARMACEUTICAL
FACTORY, LTD.,

      Defendant-Intervenors.

</td><td>

Before: Pogue, Judge

Consol. Court No. 00-08-00407

</td></tr>
</table>

[ITA determination affirmed-in-part and remanded-in-part.]

Decided: November 30, 2001

Williams Mullen Clark & Dobbins (James R. Cannon, Jr., Julia Bailey, Francisco Orellana, Jimmie V. Reyna) for Plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, Ada E. Bosque, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Emily Lawson, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

White & Case (William J. Clinton, Adams C. Lee, Robert G. Gosselink, Albert Lo) for Defendant-Intervenor Jilin Pharmaceutical Co., Ltd.

Garvey, Shubert & Barer (William E. Perry, John C. Kalitka) for Defendant-Intervenor Shandong Xinhua Pharmaceutical Factory, Ltd.

**OPINION**

**Pogue, Judge:**    This case is before the court on motions for judgment upon the agency record challenging certain aspects of the International Trade Administration of the United States Department of Commerce's ("Commerce" or "Department") Notice of Final Determination:  Sales at Less than Fair Value: Bulk Aspirin from the People's Republic of China, 65 Fed. Reg. 33,805 (Dep't Commerce May 25, 2000), as amended, 65 Fed. Reg. 39,598 (Dep't Commerce June 27, 2000)("Final Determination") and the accompanying Issues and Decision Memorandum, P.R. Doc. No. 155 (May 17, 2000)("Decision Memorandum").  This court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(2)(B)(iii).

Plaintiffs in these consolidated actions are foreign and domestic producers of bulk aspirin.  Foreign producers, Jilin Pharmaceutical Co., Ltd. ("Jilin") and Shandong Xinhua Pharmaceutical Factory, Ltd. ("Shandong"), argue that (1) Commerce erred in applying overhead costs at each upstream production stage and (2) Commerce inappropriately applied a weighted average ratio rather than a simple average ratio to calculate overhead, selling, general and administrative expenses ("SG&A"), and profit rates. Domestic producer, Rhodia, Inc. ("Rhodia") argues that (1) Commerce improperly used import data rather than domestic data as the surrogate value for phenol;  (2)Commerce erred in excluding purchased salicylic acid from Shandong's normal value calculation;

and (3) Commerce incorrectly included sales of traded goods in the denominator of the factory overhead ratio. The Department asks for a voluntary remand for the limited purpose of removing sales of traded goods from the denominator of the factory overhead ratio and recalculating the ratio.

### Background

On May 28, 1999, Rhodia filed a petition requesting the imposition of antidumping duties on imports of bulk acetylsalicylic acid, commonly referred to as aspirin, from the People's Republic of China ("PRC"). Rhodia alleged that the subject imports were being sold at prices below fair market value. The Department, in response, initiated an investigation, see Initiation of Antidumping Duty Investigation: Bulk Aspirin from the People's Republic of China, 64 Fed. Reg. 33,463 (Dep't Commerce June 23, 1999), and preliminarily determined that bulk aspirin from the PRC was being, or was likely to be, sold in the United States at less than fair value ("LTFV") as provided in section 733 of the Act. See Notice of Preliminary Determination of Sales at Less Than Fair Value: Bulk Aspirin from the People's Republic of China, 65 Fed. Reg. 116 (Dep't Commerce Jan. 3, 2000)("Preliminary Determination").

Pursuant to section 1677b(c), and in accordance with its treatment of the PRC in all past antidumping investigations,

Commerce found the PRC to be a nonmarket economy ("NME") country.[1]

See Preliminary Determination at 117.  Finding India to be at a level of economic development comparable to the PRC and a significant producer of bulk aspirin, Commerce selected India as the surrogate market economy country in accordance with 19 U.S.C. § 1677b(c)(4).    See id. at 119; see also 19 U.S.C. § 1677b(c)(1)(The normal value of goods in a NME country may be ascertained by determining the cost of the "factors of production" used to manufacture the goods.).  No party challenges the use of India as the surrogate market economy.  See Letter to Sec. Daley from the Law Firm of Stewart & Stewart, P.R. Doc. No. 75 at 1 (Oct. 8, 1999).

## Standard of Review

The Court must uphold a final determination by Commerce in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law ." 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[1]The term "nonmarket economy country" is defined by statute as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A).

## Discussion

Commerce calculates an antidumping duty margin by comparing the imported products' price in the United States to the normal value of comparable merchandise. See 19 U.S.C. § 1677b(a). Generally, normal value is the price of the merchandise in the producer's home market, its export price to countries other than the United States, or a constructed value of the merchandise. See 19 U.S.C. § 1677b(a)(1). When the exporting country is a NME country, however, section 1677b(c) requires that Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B).

## I. Application of Overhead Costs at each Upstream Production Stage

Once Commerce determined India to be the appropriate surrogate country for the PRC, it sought surrogate values for each factor of production, and for general expenses and profit. Factory overhead is "one component of a product's cost of manufacturing." See Air Prods. & Chems., Inc. v. United States , 22 CIT 433 , 441, 14 F. Supp. 2d 737, 745 (1998). The value of factory overhead is calculated as a percentage of manufacturing costs. See id.; Magnesium Corp. of Am. v. United States, 20 CIT 1092, 1102, 938 F. Supp. 885, 896 (1996). Commerce calculates a ratio of overhead to

material, labor and energy inputs ("MLE") for producers of comparable merchandise in the surrogate country, India, and then applies this ratio to the NME producer's MLE.   See 19 C.F.R. § 351.408(c)(4).

In its final determination Commerce used data from three Indian producers of aspirin inputs to separately account for overhead costs for each upstream production stage for Jilin and Shandong.[2]  Commerce determined that "the degree of integration of a facility affects a facility's overhead costs."  Def.'s Mem. Opp'n to Mot. J. Agency R. at 22 ("Def.'s Mem.").  Because it determined that none of the Indian producers reflect the degree of integration represented by Shandong and Jilin, Commerce concluded that a single application of an overhead ratio would understate overhead expenses, not reflecting the expenses incurred to produce two major inputs into aspirin and the final aspirin product itself.  Decision Memorandum at 11-12.

Jilin and Shandong argue, however, that not only did Commerce merely assume that a fully integrated producer has a higher overhead to raw material input ratio than a non-integrated producer, but Commerce also assumed that the operations of the Indian producers were not fully integrated.  Shandong further argues that Commerce's methodology is a change from Commerce's prior practice and contrary to the plain language of the statute.

---

[2]Commerce used surrogate values from three Indian producers: Alta Laboratories, Ltd. ("Alta"), Andhra Sugars, Ltd. ("Andhra"), and Gujarat Organics, Ltd. ("Gujarat").  See Shandong Br. at 24.

**A.  Accordance with law**

Section 1677b(c) requires normal value to be calculated "on the basis  of the value of the factors of production utilized . . . to which shall be added <u>an amount</u> for general expenses and profit plus the cost of containers, coverings, and other  expenses."  19 U.S.C.  §  1677b(c)(emphasis  supplied).   Shandong argues that Commerce, by applying an overhead ratio at each upstream production stage, added <u>amounts</u> and <u>costs</u> into the dumping margin calculation. Shandong Br. Supp. Mot. J. Agency R. at 13 ("Shandong Br."). Rather, according to Shandong, Commerce should have applied the overhead  amount  at  one  time  and  as  an  overall  percentage.   In support  of  this  argument,  Shandong  cites  to  the  Department's <u>Antidumping Manual</u> and what it argues is mandatory language in the statute.    <u>See</u>  <u>id.</u>  at  13-14;  Int'l  Trade  Admin.,  U.S.  Dep't Commerce,  <u>Antidumping Manual</u> , Chap. 8 at 85(1998)(" <u>Antidumping Manual</u>");  19 U.S.C. § 1677b(c).

The statute does require that the Department include an amount for  overhead  expenses.    Commerce,  contrary  to  Shandong's assertions, did only include "an" amount.  "Amount" is defined as "a: the total number or quantity; b: the quantity at hand or under consideration."   Merriam-Webster,<u>available at</u> http://www.m-w.com. In  this  case,  Commerce  argues  that  to  account  for  the  overhead expenses of an integrated producer, it was necessary to look at the expenses incurred during each stage of the multi-stage production process.  Commerce used surrogate factory overhead values for each stage  of  the  multi-stage  process  and  calculated  a  total  amount

based on these figures.  The calculated overhead rate was not contrary to the statute as only a single figure for general expenses and profit was included in normal value.  Normal value, therefore, only included the total number and quantity under consideration, consistent with "an amount," not "amounts" as Shandong contends.

Furthermore, Shandong's reliance on the Antidumping Manual is misplaced.[3]  The manual, under a section entitled "Sample Calculation for [Normal Value]," presents a "very simple example of the type of factors valuation calculation that is done in investigations or reviews involving merchandise from a NME country." Antidumping Manual, Chap. 8 at 92.  The methodology that the manual presents is merely an example; further, it is a "very simple example."  This implies that Commerce is not bound exactly to this very simple example in the Antidumping Manual; rather, the Manual presents a model that illustrates one approach to calculating the factory overhead ratio.  The production process utilized in the making of bulk aspirin, however, is not a simple process.  Therefore, Commerce did not depart from prior practice by not following the Antidumping Manual's "simple example"; but

---

[3]It should be noted that while the Antidumping Manual "is not a binding legal document, it does give insight into the internal operating procedures of Commerce." Koenig & Bauer-Albert AG v. United States, 24 CIT __, __, 90 F. Supp. 2d 1284, 1292 n.13 (2000), aff'd in part, vacated in part, remanded by 259 F.3d 1341 (Fed. Cir. 2001).

instead used this model and adapted it to a more complex situation.

### B.  Substantial Evidence

Shandong and Jilin also argue that the Department did not show why overhead would be higher for an integrated producer, nor support its finding that Indian producers have a lower overhead with evidence from the record.

Commerce's determination is reviewed on the basis of the reasons articulated and evidence relied on in its decision.  SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).  Furthermore, Commerce must articulate a "rational connection between the facts found and the choice made."  Burlington Truck Lines, Inc. v.  United States, 371 U.S. 156, 168 (1962).

In this case, Commerce adopted Rhodia's argument, stating in its Decision Memorandum that "[a] fully integrated producer will have an overhead to raw material input ratio that is higher than the same ratio for a non-integrated producer, other things being equal."  Decision Memorandum at 11 ("[W]e agree with the petitioner that degree of integration is a relevant factor that can affect overhead rates.").  Beyond this conclusory statement, Commerce gave no explanation for its finding that producers of bulk aspirin in the PRC are more integrated than the surrogate producers in India. See id. at 11-12.  The Decision Memorandum also failed to identify any evidence in the record to support Commerce's conclusion.  For example, Commerce does not cite any evidence to support its finding that vertically integrated producers have higher overhead costs or

that, except with regard to the level of integration, the Indian and PRC producers are otherwise "equal." Although Commerce's brief addresses in greater detail the reasons that integrated producers have higher overhead costs, the "'post hoc rationalizations' of counsel [cannot] supplement or supplant the rationale or reasoning of the agency." Hoogovens Staal BV v. United States, 24 CIT __, __, 86 F. Supp. 2d 1317, 1331 (2000)(internal citations and quotations omitted); see also Burlington Truck Lines, 371 U.S. at 168-69; Fed. Power Comm'n v. Texaco, Inc., 417 U.S. 380, 397 (1974).

Not only, however, did the Decision Memorandum state that integrated producers have higher overhead costs than non-integrated producers generally, Commerce also found that producers of bulk aspirin in the PRC were more fully integrated than the Indian surrogates. See Decision Memorandum at 11 ("After considering all available information on the record, [Commerce] determine[d] that none of the Indian producers reflect the degree of integration represented by the respondents in this investigation."). Of the three surrogate companies only one, Andhra, produces aspirin, and its aspirin production is equal to just 3.57 percent of the company's total sales. See id. The other surrogate Indian companies, Alta and Gujarat, do not produce aspirin but do produce salicylic acid and derivatives. See id. Based on this evidence, Commerce determined that the Indian surrogates only produce aspirin inputs and, therefore, "are more representative of the overhead expense incurred by the upstream input producers." Id. at 12.

Commerce's determination that the Indian surrogate companies only produce aspirin inputs is flawed.  This statement is based on the premise that (1) Andhra produces only a minuscule amount of aspirin, so the majority of its output is also aspirin inputs;[4] and (2) Alta and Gujarat produce salicylic acid and derivatives and that these derivatives are aspirin inputs.  While salicylic acid is an input in aspirin production, aspirin is also a derivative of salicylic acid.  See Jilin Mem. Supp. Mot. J. Agency R. at 18 ("Jilin Br.").  Salicylic acid derivatives, therefore, are not necessarily just aspirin inputs.  Alta and Gujarat, as producers of "salicylic acid and derivatives," and Andhra as a producer of bulk chemicals other than aspirin, could be producers of merchandise identical or comparable to aspirin.  Therefore, the conclusion that Indian surrogates only produce aspirin inputs does not follow from the premise that Alta and Gujarat produce salicylic acid derivatives and Andhra produces bulk chemicals.  Consequently, Commerce's conclusion is not based on a reasonable inference drawn from the evidence in the record.

As previously discussed, Commerce's findings must be "reached by 'reasoned decision-making,' including . . . a reasoned

---

[4]The majority of Andhra's production is bulk chemicals other than aspirin.  These chemicals include acetic acid, acetic anhydride and caustic soda.  See Decision Memorandum at 11-12. According to Commerce, many of these chemicals are inputs for aspirin production.  See id.  Absent some explanation from Commerce, the Court cannot determine whether this evidence is sufficient to support Commerce's conclusion that Andhra's overhead costs are not representative because the chemicals produced are the result of a less integrated production process.

explanation supported by a stated connection between the facts found and the choice made." Elec. Consumers Res. Council v. Fed. Energy Regulatory Comm'n, 747 F.2d 1511, 1513 (D.C. Cir. 1984)(citing Burlington Truck Lines, 371 U.S. at 168). Here, Commerce has not drawn a reasonable inference from the evidence in the record in order to support its finding that producers in the PRC are more fully integrated than the Indian producers or that the salicylic acid derivatives produced by Alta and Gujarat or the chemicals produced by Andhra are the result of a less integrated production process.

By failing to make any findings regarding its choice, see Taiwan Semiconductor Indus. Ass'n v. United States, 23 CIT __, __, 59 F. Supp. 2d 1324, 1336 (1999), aff'd, 266 F.3d 1339 (Fed. Cir. 2001), Commerce errs. Accordingly, Commerce's overhead calculation is remanded for reconsideration. On remand, Commerce is to articulate the facts in the record that support its remand determination.

## II. Weighted Average v. Simple Average

In the final determination, Commerce calculated surrogate overhead, SG&A, and profit ratios using a weighted average of the three Indian producers; Alta, Andhra, and Gujarat.[5] Jilin and

_____

[5]Commerce's treatment of the overhead ratio provides an example of the weighted average calculation. Commerce calculated overhead ratios "by dividing the total overhead expenses for all

Shandong argue that a weighted average is not appropriate when there are a limited number of data points, that Commerce has a long-standing practice of using simple averages, and that the decision to use a weighted average is not supported by substantial evidence.[6]  See Jilin Br. at 7, 22; Shandong Br. at 12.

In almost every antidumping investigation where Commerce uses only a few surrogate companies, Commerce applies a simple average to derive overhead, SG&A, and profit.[7]  See, e.g., Certain

_____

three producers by the total expenses for materials, labor, and energy.  A simple average overhead ratio would first calculate the overhead ratios for each of the three producers, and then take the straight average of those three ratios." Jilin Br. at 22 n.72.

[6]Rhodia argues that Shandong and Jilin did not previously raise this issue and therefore waived their right to have this Court review it.  Exhaustion, however, is only required to the extent that the court determines it appropriate.  26 U.S.C. § 2637(d).  Here, Shandong and Jilin were under no notice that Commerce would apply a weighted average.  It was not until the Factors Valuation Memorandum on May 17, 2000 that the decision to use a weighted average was made.  See Memorandum, Factors of Production Valuation for the Final Determination, P.R. Doc. No. 156 at 1 (May 17, 2000)("Final Factors Memo.").  This was the same day the Decision Memorandum was issued.  See Decision Memorandum at 1.  Accordingly, neither Shandong nor Jilin will be required by the court to further exhaust its administrative remedies with regard to this issue.

[7]In some cases, Commerce relies upon weighted average information derived from the Reserve Bank of India Bulletin.  This information, however, is based on the aggregated financial statistics of an entire industry sector.  Here, Commerce only used financial data from three companies.  When only a small set of numbers are used to calculate a weighted average overhead ratio, the result will be significantly affected by the size of the companies.  In this case Commerce's weighted average was 21.06.  See Final Factors Memo. at 12.  This is close to the overhead ratio of Andhra, the largest of the three Indian

Preserved Mushrooms From the People's Republic of China, 65 Fed. Reg. 66,703, 66,707 (Dep't Commerce Nov. 7, 2000); Certain Cut-to-Length Carbon Steel Plate from the People's Republic of China, 62 Fed. Reg. 61,964, 61,970 (Dep't Commerce Nov. 20, 1997). In only one case did Commerce explicitly use a weighted average, and the decision was not, in that case, questioned by the parties. See Final Results: Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China, 64 Fed. Reg. 61,837 (Dep't Commerce Nov. 15, 1999). The issue of averages is specifically addressed in very few cases, the most informative being Notice of Final Determination of Sales at Less Than Fair Value: Bicycles From the People's Republic of China, 61 Fed. Reg. 19,026, 19,039 (Dep't Commerce Apr. 30, 1996)("Bicycles").

In Bicycles, the respondents asked Commerce to calculate a weighted average factory overhead, SG&A, and profit for each Indian producer of bicycles because, the respondent argued, a clear correlation existed between costs and production quantities for all of the Indian bicycle producers. The Department rejected this position, agreeing with the petitioners that the use of the weighted average method would imply that the experience of larger Indian producers was more representative of Chinese producers than smaller Indian producers. According to the Department not all

---

producers. See id. To calculate Andhra's overhead ratio of 21.64, we divided Andhra's overhead cost of 372,987,500 by its MLE of 172,353,400. See id. at Exhibit EE.

Chinese producers were large scale producers.  Moreover, several factors, other than costs and production quantities, could affect overhead, SG&A, and profit ratios.  Consequently, Commerce "used a simple average . . . consistent with [its] normal practice because, barring evidence to the contrary, we assume that all of these surrogate values are equally representative of the surrogate experience."  Id. (emphasis added).

Here, no such findings concerning representativeness were made.  Commerce applied a weighted average with no explanation of its reasoning.  The general practice of Commerce is to apply a simple average.  In order to depart from this practice Commerce needs to "explain the reasons for its departure."  Hussey Copper, Ltd. v. United States, 17 CIT 993, 997, 834 F. Supp. 413, 418 (1993)(internal quotations and citations omitted); Allegheny Ludlum Corp. v. United States, 24 CIT __, __, 112 F. Supp. 2d 1141, 1147 (2000).  It is possible, on remand, that Commerce will determine that a weighted average is the correct method to calculate the necessary ratios.  Commerce must, however, give an explanation for this decision.  See, e.g., Bicycles, 61 Fed. Reg. at 19,039 (indicating the necessity of citing evidence as to why the surrogate values are or are not "equally representative of the surrogate experience").

**III. Import Data v. Domestic Data**

Not only must Commerce assign surrogate values for general expenses, but Commerce must also assign surrogate values to each factor of production in order to construct a normal value.[8]  One such factor of production is phenol, an aspirin input.  <u>See Preliminary Determination</u> at 119; <u>see also</u> 19 U.S.C. § 1677b(c)(3).  In order to calculate normal value Commerce assigned a value to phenol using surrogate Indian prices.

India imposes a tariff on phenol imports that can be waived through a duty drawback system.  According to Commerce, this creates a "two-tiered" price structure, one for use in the sale of domestic products and the other for use in the sale of merchandise for export.  As a result of India's tariff structure, Commerce determined that the Indian domestic phenol price was artificially high and, therefore, valued phenol by using the import price from the <u>India Chemical Weekly</u>.  Rhodia contends that Commerce not only departed from prior practice by using the import price rather than the domestic price but that this decision was also not supported by substantial evidence.  <u>See</u> Mem. Supp. Rhodia's Mot. J. Agency R. at 2 ("Rhodia's Br.").

---

[8]Factors of production include, but are not limited to, labor, raw materials, utilities and capital costs.  <u>See</u> 19 U.S.C. § 1677b(c)(3).

## A.  Departure from Prior Practice

"[T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  19 U.S.C. § 1677b(c)(1).  As the statute does not define "best available information," it "grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis."  Timken Co. v. United States, slip op. 01-96, at 12 (CIT Aug. 9, 2001).  This discretion is curtailed by the purpose of the statute, i.e., to construct the product's normal value as it would have been if the NME country were a market economy country.  See Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999); Baoding Yude Chem. Indus. Co., Ltd. v. United States, slip op. 01-117, at 4 (CIT Sept. 26, 2001); see also Air Prods. & Chems., 22 CIT at 435, 14 F. Supp. 2d at 741 (citing Tianjin Mach. Import & Export Corp. v. United States, 16 CIT 931, 940, 806 F. Supp. 1008, 1018 (1992); Timken Co. v. United States, 16 CIT 142, 144, 788 F. Supp. 1216, 1218 (1992)[9]).

In previous administrative reviews of a Chinese product containing phenol, Commerce used the Indian domestic value of

---

[9]These cases, regarding Commerce's NME methodology, were decided under the pre-Uruguay Round version of the antidumping statute.  However, this aspect of the statute was not changed by the Uruguay Round amendments.  Compare 19 U.S.C. § 1677b(c)(1988) with 19 U.S.C. § 1677b(c)(1994).

phenol in calculating normal value.  Specifically, Rhodia points to

Commerce's actions in Sebacic Acid from the People's Republic of

China, 64 Fed. Reg. 69,503 (Dec. 13, 1999) and the preliminary

determination in the subsequent annual review of Sebacic Acid, 65

Fed. Reg. 18,968, 18,971 (April 10, 2000), where Commerce used the

India Chemical Weekly average domestic price.  The valuation of

phenol in those administrative reviews does not, however, require

Commerce to use the domestic phenol price in the present case.  The

decision on which price to use - domestic or import - is based on

which value will result in a more accurate normal value.  In the

past, the domestic phenol value may have been "best available

information."  Previous circumstances and the mere fact that the

domestic price is available do not require Commerce to continue

using the domestic value of phenol.  See Issues and Decision

Memorandum for the Administrative Review of Manganese Metal from

the People's Republic of China, 66 Fed. Reg. 15,076 (Dep't Commerce

March 15, 2001)("[A] surrogate value which is the best available

information during one investigation or review does not necessarily

remain the best available information during subsequent reviews.").

In fact, in the final determination for Sebacic Acid Commerce did

not value phenol using domestic India Chemical Weekly data and

instead valued phenol using India Chemical Weekly import data.  See

Sebacic Acid from the People's Republic of China, 65 Fed. Reg.

49,537 (Dep't Commerce Aug. 14, 2000).

Rhodia notes that Commerce has a stated preference for the use
of the domestic price over the import price, all else being equal.
This preference, as previously discussed, does not require Commerce
to use the domestic price in <u>all</u> circumstances.  The use of the
domestic price as surrogate values is not appropriate when the
available domestic data is distorted by a protective tariff.  <u>See</u>
<u>Nation Ford</u>, 166 F.3d at 1377; <u>Baoding Yude</u>, slip op. 01-117 at
14;[10] <u>Decision Memorandum</u> at 5-6.  In such situations the domestic
and import price are not "equal" surrogates.  This practice is
consistent with Congress' intention that Commerce not use distorted
surrogate prices.  <u>See</u> <u>Nation Ford</u>, 166 F.3d at 1377-78; H.R. Conf.
Rep. No. 100-576, at 590 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N.
1547, 1623.  Furthermore, in the past, Commerce has used import
prices to value factors of production where it determines that the
import price is the more accurate value.  <u>See</u> <u>Nation Ford Chem. Co.</u>
<u>v. United States</u>, 21 CIT 1371, 1373, 985 F. Supp. 133, 135 (1997),
<u>aff'd</u>, 166 F.3d 1373 (Fed. Cir. 1999); <u>Nation Ford Chem. Co. v.</u>
<u>United States</u>, 21 CIT 1378, 1378-79, 985 F. Supp. 138, 139-40
(1997); <u>Tehnoimportexport, UCF Am. Inc. v. United States</u>, 16 CIT

_____

    [10]This Court's opinion in <u>Baoding Yude</u> is consistent with
Commerce's decision here.  In <u>Baoding Yude</u>, the previous
distortion of the domestic price was substantially diminished by
the reduction in the tariff.  <u>See</u> <u>Baoding Yude</u>, slip op. 01-117,
at 14-17.  Therefore, the import price was no longer the best
available information, as it had been in previous administrative
reviews; rather, the use of the domestic price resulted in the
most accurate normal value.

13, 15-16, 783 F. Supp. 1401, 1404-05 (1992).

Therefore, in accordance with the statute, Commerce has the discretion to determine that the import price of phenol is the more accurate surrogate value for determining normal value in the PRC under the circumstances present during the period of investigation. Thus, Commerce's use of import values is not a departure from its prior practice and is appropriate as long as its decision is supported by substantial evidence.

**B.  Substantial Evidence**

According to Rhodia, the Indian tariff cited by Commerce does not distort the domestic price but distorts the import price. Rhodia Br. at 14, 19.  Rhodia argues that Commerce ignored the evidence, including the safeguard measures imposed by India on phenol imports, demonstrating the tariff's effect on the import price.    Id. at 18.    Rhodia also contends that the record establishes that the Indian surrogate producers purchase the majority of their raw materials domestically and therefore Commerce should have used the domestic price for phenol.  Id. at 18-19. Lastly, Rhodia argues that Commerce's normal value determination was internally inconsistent.  Id. at 19.

There is substantial evidence supporting Commerce's use of the import price to value phenol rather than the domestic price. Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." Consol. Edison Co v. NLRB, 305 U.S. 197, 229 (1938).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Here, Commerce's main reason for using the import value of phenol was the existence of the 59.97 percent tariff imposed on imports.  See Decision Memorandum at 6.  This import tariff, according to Commerce, resulted in the distortion of the Indian domestic price.  In support of its decision, Commerce demonstrated that by adjusting "the weight-averaged import phenol price (from ICW) of 29.81 Rs/kg by the tariff percentage, the resulting value, 46.51 Rs/kg, is virtually equal to the weight-averaged domestic phenol price from ICW - 46.50 Rs/kg." Id.[11]  Commerce reasoned that the high tariff, in this case, is being used to protect domestic phenol.  While it may be, as Rhodia claims, that the evidence in the record could be construed to reach a different result, this

---

[11]If the import price adjusted by the tariff is either equal to or greater than the domestic price, as is the case here, it supports Commerce's finding that the domestic price is "distorted," in that it is protected by the tariff.  The import price is therefore a lower price and the tariff is added to make the imported product more expensive in comparison to the domestic product.  The reverse is also true.  If the adjusted import price is less than the domestic price, it supports a finding that the domestic price is no longer protected by the tariff.  See, e.g., Baoding Yude, slip op. 01-117, at 14.

court cannot conclude that Commerce's inference is unreasonable.
See Am. Silicon Techs. v. United States, 23 CIT __, __, 63 F. Supp.
2d 1324, 1331 (1999), aff'd, 261 F.3d 1371 (Fed. Cir. 2001)("The
specific  determination  we  make  is  whether  the  evidence  and
reasonable  inferences  from  the  record  support"  Commerce's
findings.)(quoting Daewoo Elecs. v. United States, 6 F.3d 1511,
1520 (Fed. Cir. 1993)).

Commerce need not use the domestic value of phenol, as Rhodia
suggests,  merely  because  the  surrogate  Indian  producers  use
primarily domestic raw material inputs.  See Nation Ford, 166 F.3d
at 1377.  In calculating normal value in a NME country, Commerce
must determine what the market price for inputs would be in the PRC
"if such prices . . . were determined by market forces."  Nation
Ford, 21 CIT at 1373, 985 F. Supp. at 135 (internal citations and
quotations omitted).  Best available information is not a distorted
domestic price, even if the producers in the surrogate country use
the domestic product.  Rather, best available information is the
price that results in the most accurate calculation of what the
cost of production would be in the PRC if the PRC were a market-
economy country.

Moreover, Commerce did not, as Rhodia appears to argue, ignore
the effects of India's safeguard duties on the Indian import price
of phenol.  In the Decision Memorandum, Commerce addresses Rhodia's
concerns about India's invocation of the WTO's Safeguards Clause on

phenol imports.  See Decision Memorandum at 6.  Commerce noted that although the safeguard action did impose a duty on all imports of phenol, this duty was not applied until after the period of investigation.  See id.; see also Rhodia Br. at 18.  India did not even invoke the WTO Safeguards Clause until August 12, 1999, more than four months after the end of the period of investigation.  See Preliminary Determination at 117; Final Determination at 33,805.

Furthermore, a safeguards action does not indicate that the price of phenol imports was distorted.  Safeguard actions do not account for whether imports are being dumped or are fairly traded.  See WTO Agreement on Safeguards at Art. 2.1.  The only evidence needed to impose a safeguard duty is injury to the domestic market.  See id.  The safeguards action, therefore, does not demonstrate that phenol imports were not fairly traded.[12]

Moreover, Commerce's determination was also internally consistent.[13]  Rhodia refers to Lasko Metal Prods., Inc. v. United States, 16 CIT 1079, 1081, 810 F. Supp. 314, 317 (1992), aff'd, 43

---

[12]As further evidence that the domestic values were distorted by tariffs, Jilin notes that the domestic values "increased substantially after the imposition of the safeguard duties." Jilin Br. Opp'n Rhodia's Mot. J. Agency R. at 15.

[13]Rhodia also states that Commerce used an "extreme comparison," comparing "the highest domestic value from any source with the lowest import value." Rhodia Br. at 15 (emphasis omitted).  Commerce, however, compared the average India Chemical Weekly import value with average India Chemical Weekly domestic value to determine the effect of the tariff.  The comparison of two average values is a reasonable comparison, especially when the two values are obtained from the same source.

F.3d 1442 (Fed. Cir. 1994), in support of its argument that use of the import price for phenol's surrogate value does not promote accuracy in the dumping margin.  In Lasko, the parties challenged Commerce's "mix and match" methodology.[14]  Id. at 1080, 810 F. Supp. at 317.  In that case, this court held that a mix and match methodology is permissible under the statute, and "[o]nly if the combination of surrogate values . . . would somehow produce less accurate results would Commerce's use of this information be unreasonable."  Lasko, 16 CIT at 1081, 810 F. Supp. at 317.

Here, Commerce found that the best available information for determining normal value is the Indian import price for phenol. Commerce determined that the use of the import price, even though it resulted in a mix and match methodology, produced a more accurate result than using domestic prices to value all the surrogate costs.  This court has recognized Commerce's use of both import and domestic prices in order to obtain a more accurate normal value.  See Nation Ford, 166 F.3d at 1378 (Section "1677b(c) merely requires the use of the 'best available information' with respect to the valuation of a given factor of production; it does not require that a uniform methodology be used in the valuation of

---

[14]This "mix and match" methodology refers to a combination of values used to calculate normal value.  Lasko involved the combination of surrogate values and prices paid by NME producers to market-economy suppliers.  Lasko, 16 CIT at 1080-81, 810 F. Supp. at 316.  The arguments in Lasko are equally compelling in the instant case, where Commerce used different surrogate sources within a single surrogate country to determine the most accurate normal value.

all relevant factors.").

Moreover, the "purpose of the [NME] factors of production methodology . . . is not to construct the cost of manufacturing the subject merchandise in India per se but to use data from one or more surrogate countries to construct what the cost of production would have been in China were China a market economy." Baoding Yude, slip op. 01-117, at 22 (internal citations and quotations omitted). As a result, Indian producers' costs are not necessarily the appropriate surrogates for all costs. Here, the domestic price of phenol was a distorted price because, as Commerce explained, the high tariff on imports influenced domestic prices. Consistent with Congress' directive to avoid such distortions, Commerce rejected what it found to be an inaccurate domestic price, instead using a "mix and match methodology" that allowed it to obtain the most accurate normal value. "This type of line-drawing exercise is precisely the type of discretion left within the agency's domain." Baoding Yude, slip op. 01-117, at 17-18. As long as Commerce's methodology "seek[s] to effectuate the statutory purpose – calculating accurate dumping margins," as is the case here, and is supported by substantial evidence, the margin will be upheld. Shakeproof Assembly Components v. United States, 23 CIT __, __, 59 F. Supp. 2d 1354, 1358 (1999).

Here, Commerce "explain[ed] its finding of significance, with sufficient . . . reference to the record[,]" and it is not the role

of this Court to re-weigh that evidence. <u>Shakeproof Assembly Components v. United States</u>, 24 CIT __, __, 102 F. Supp. 2d 486, 495 (2000), <u>aff'd</u>, slip op. 00-1521 (Fed. Cir. Oct. 12, 2001). Therefore, determining that the import value for phenol was the best available information on the record was a proper exercise of Commerce's discretion.

**IV.  Calculation of Normal Value for Shandong**

Salicylic acid is a major input in bulk aspirin.  Shandong both purchases and produces salicylic acid.  According to Shandong, whether it purchases or produces salicylic acid determines the quality of the end product.  Based in part on this information, Commerce concluded that only self-produced salicylic acid was used in the production of the subject merchandise.  As a result, Commerce excluded costs associated with Shandong's purchase of salicylic acid, only including costs associated with Shandong's self-production of salicylic acid in calculating Shandong's normal value.

Rhodia, however,  argues that the record does "not support the conclusion that domestic-quality aspirin was in all cases inferior or even different" from export-quality aspirin.  Rhodia Br. at 23. According to Rhodia, Commerce "assume[d]" domestic-quality and export-quality aspirin were different "solely on the basis of whether the aspirin has a certificate of compliance with the USP

standard."    Id.    Commerce, in Rhodia's view, erred by not considering whether purchased salicylic acid was used in aspirin essentially equivalent to USP23-grade aspirin.[15]

## A.    Subject Merchandise

The antidumping statute defines the subject merchandise as part of "the class or kind of merchandise that is within the scope of an [antidumping] investigation."  19 U.S.C. § 1677(25).  The only type of aspirin that can be sold in the United States is that meeting USP standards.  See Preliminary Determination at 117; Petition from Law Firm of Stewart & Stewart to Sec. Commerce, C.R. Doc. No. 1 at 40 (May 5, 1999).  As a result, in the investigation, Commerce defined the subject merchandise as bulk aspirin meeting USP23 standards.[16]

---

[15]Rhodia contends that Commerce did not establish that CP95 certified aspirin, the Chinese aspirin standard, is inferior to USP23 aspirin, the United States aspirin standard.  This argument was not previously made before the agency because, according to Rhodia, the issue was not raised until verification.  Therefore, Rhodia asks the court to take judicial notice of the published standards, USP23 and CP95.  It is not necessary for the Court to consider Rhodia's request as Commerce's determination on the scope of the investigation is affirmed.

[16]The scope of the investigation was determined to be:

bulk acetylsalicylic acid, commonly referred to as bulk aspirin, whether or not in pharmaceutical or compound form, not put up in dosage form (tablet, capsule, powders or similar form for direct human consumption).  Bulk aspirin may be imported in two forms, as pure ortho-acetylsalicylic acid or as mixed ortho-acetylsalicylic acid.  Pure ortho-acetylsalicylic acid can be either in crystal form or granulated into a fine powder

Preceding the Initiation Notice, Commerce set aside a period for parties to comment upon product coverage. Rhodia did not attempt to do so. Even more compelling is that Rhodia, as the petitioner in the underlying investigation, specified USP standards as a description of the subject merchandise. See Initiation Notice at 33,463-64. Rhodia argues that the issue of the scope of the subject merchandise was not raised until verification. However, Rhodia, as a party to the investigation, helps Commerce to "guide the [investigation] process and must alert the agency to matters which [it] believe[s] require unusually detailed inquiry." Allied Tube & Conduit Corp. v. United States, 25 CIT __, __, 132 F. Supp. 2d 1087, 1092 (2001); see generally Wheatland Tube Co. v. United States, 21 CIT 808, 973 F. Supp. 149 (1997), aff'd, 161 F.3d 1365 (1998).

Commerce, in its Final Determination, found "that bulk aspirin produced [by Shandong] for the Chinese domestic market (i.e. domestic-quality aspirin) [was] distinct, in quality and composition, from subject merchandise." Decision Memorandum at 20. The subject merchandise is USP quality aspirin, not just aspirin exported to the United States, as Rhodia claims. The Department

---

(pharmaceutical form). This product has the chemical formula $C_9H_8O_4$. It is defined by the official monograph of the United States Pharmacopoeia ("USP") 23. It is classified under the Harmonized Tariff Schedule of the United States ("HTSUS") subheading 2918.22.1000.

Preliminary Determination at 117.

specifically found that the Chinese domestic-quality aspirin produced by Shandong was of a different quality than that meeting USP standards.  See id. ("Shandong's domestic-quality aspirin is not within the scope of this investigation because it does not meet the quality standards, as established by the United States Pharmacopoeia.").  As a result, Commerce properly determined that Shandong's domestic-quality aspirin was not within the scope of the investigation because it did not meet the USP quality standards.[17]

The statute requires Commerce to calculate normal value "on the basis of the value of the factors of production utilized in producing the merchandise."  19 U.S.C. § 1677b(c)(1). During the course of Commerce's verification of Shandong's facilities, Commerce "reviewed invoices, certificates of analysis and production/batch reports for both domestic and export sales of subject merchandise." Def.'s Br. at 50; see also Memorandum, Results of Sales Verification of Shandong Xinhua Pharmaceutical Factory, P.R. Doc. No. 140 at 12 (April 4, 2000); Shandong Verification Ex. at F-4.  Commerce verified that Shandong only uses self-produced salicylic acid in the manufacture of export-quality

---

[17] Additional evidence exists in the record demonstrating that the USP23 standard has sixteen inspection items while CP95 has only eight.  See Shandong Br. Opp'n Rhodia's Mot. J. Agency R. at 32 (citing to Shandong Verification Ex. at S-4); see also Shandong Verification Ex. at F-8.  Based on this, Commerce could reasonably conclude that USP23 is a more difficult standard to meet.

salicylic acid.  See Decision Memorandum at 20.[18] In accordance with

the statute, Commerce only includes those factors of production,

such as Shandong's self-produced salicylic acid, actually used in

producing the subject merchandise, USP quality aspirin.  See id. at

20-21.   Therefore, Commerce correctly determined and applied the

scope of the subject merchandise.

### B.    Low Cost

Rhodia argues that Commerce is allowing Shandong to manipulate

normal value through "cost-shifting."  E.I. DuPont de Nemours & Co.

v. United States, 4 F. Supp. 2d 1248, 1253 (1998).   Allegedly, in

order to manipulate the normal value in this manner, Shandong would

assign low cost inputs, i.e. phenol, to U.S. exports and high-cost

inputs, i.e. salicylic acid, to domestic sales.

As  previously  discussed,  Commerce's  decisions  to  use  the

_____

[18]All the parties agree that salicylic acid is sold in
different grades.  See Petition from Law Firm of Stewart &
Stewart to Sec. Of Commerce, P.R. Doc. No. 1 at 13 (May 28,
1999).  "[W]ithout further processing, salicylic acid contains
impurities such as sodium sulfate."  Id.  This grade is
"typically termed 'technical' grade salicylic acid."  Id. at 14.
According to Rhodia, "pharmaceutical grade" salicylic acid,
without any impurities, is needed to produce aspirin.  See id.
Although "technical-grade" salicylic acid could be used to
produce USP quality aspirin if it undergoes a "sublimation
process," see id., there is no indication that the technical-
grade salicylic acid purchased by Shandong actually goes through
such a process.  Therefore, Commerce's determination that
Shandong produces two distinct products is consistent with
Rhodia's claim that only pharmaceutical grade salicylic acid can
be used to produce USP quality aspirin.

import value of phenol and to exclude the cost of purchased salicylic acid are supported by substantial evidence and otherwise in accordance with law. Furthermore, Commerce determined that "Shandong uses one production process and one production facility to produce two distinct products." Decision Memorandum at 20. Because there is only one production process, Commerce reasonably concluded that it did not allow Shandong to assign the low-cost production process to serve as a basis for normal value. Id. at 21.

## V.   Traded Goods

Commerce, in its final determination, included the cost of Gujarat's "trade sales" in the denominator of the factory overhead rate. "Trade sales" or "traded goods" are products that "are already manufactured and do not affect production."[19] Timken Co. v. United States, 23 CIT __, __, 59 F. Supp. 2d 1371, 1379 (1999); Timken Co., slip op. 01-96, at 48. The Timken cases held that Commerce should not include sales of traded goods in the denominator for calculating an overhead ratio because these goods have no effect on production. Timken Co., slip op. 01-96, at 48-50.

Commerce, recognizing its error in this regard, asks for a

---

[19]The parties refer to "trade sales" and "traded goods." In this case, the reporting of the "trade sales" is synonymous with "traded goods." Both are finished merchandise that do not affect production.

voluntary remand to remove traded goods from the denominator for the calculation of overhead ratio.  Although all the parties agree that the inclusion of trade sales has a minimal effect on the overall ratio if Commerce continues to use a weighted average, remand of this issue to Commerce is appropriate as this court is remanding other aspects of the final determination, including Commerce's use of a weighted average.  Accordingly, Commerce's request is granted.

## Conclusion

The Department shall reconsider its determination in a manner consistent with this opinion.  The Department shall file its remand determination with the Court within 90 days.  The parties are granted 30 days to file comments on the remand determination.  The Department may respond to any comments filed within 20 days.

_____
Donald C. Pogue
Judge


Dated:     November 30, 2001
           New York, New York