**Slip Op. 02-56**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  RICHARD K. EATON, JUDGE**

| | | |
|---|---|---|
| **YANTAI ORIENTAL JUICE CO., ET AL.,** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Court No. 00-07-00309** |
| | : | |
| **UNITED STATES,** | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| **COLOMA FROZEN FOODS, INC., ET AL.,** | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

[Antidumping determination remanded.]

Decided: June 18, 2002

Grunfeld, Desiderio, Lebowitz, & Silverman L.L.P. (Bruce M. Mitchell, Jeffrey S. Grimson and Mark E. Pardo), for Plaintiff.

Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Lucius B. Lau, Commercial Litigation Branch, Civil Division, United States Department of Justice; Scott D. McBride, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

The Law Firm of C. Michael Hathaway (C. Michael Hathaway), for Defendant-Intervenors.

EATON, Judge: This case is before the court on the motion of Yantai Oriental Juice Co., ("Yantai Oriental"), Qingdao Nannan Foods Co. ("Nannan"), Sanmenxia Lakeside Fruit Juice Co., Ltd. ("Lakeside Fruit Juice"), Shaanxi Haisheng Fresh Fruit Juice Co. ("Haisheng"), Shandong Zhonglu Juice Group Co. ("Zhonglu"), Xianyang Fuan Juice Co., Ltd. ("Fuan"), Xian Asia Qin Fruit Co., Ltd. ("Asia"), Changsha Industrial Products & Minerals Import & Export Corp. ("Changsha Industrial"), and Shandong Foodstuffs Import & Export Corp. ("Shandong Foodstuffs") (collectively "Plaintiffs") for judgment upon the agency record pursuant to USCIT R. 56.2. By their motion, Plaintiffs contest certain aspects of the Department of Commerce's ("Commerce") determination resulting from its antidumping investigation of non-frozen apple juice concentrate ("AJC") from the People's Republic of China ("PRC"), see Notice of Final Determination of Sales at Less Than Fair Value: Certain Non-Frozen Apple Juice Concentrate From the P.R.C., 65 Fed. Reg. 19,873 (Apr. 13, 2000) ("Final Determination"), amended by Notice of Amended Final Determination of Sales at Less than Fair Value and Antidumping Duty Order: Certain Non-Frozen Apple Juice Concentrate From the P.R.C., 65 Fed. Reg. 35,606 (June 5, 2000) ("Amended Final Determination"), covering the period of investigation ("POR") October 1, 1998, through March 31, 1999. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (2000). For the reasons stated below, the court remands this matter to Commerce for further proceedings in conformity with this opinion.

## BACKGROUND

Commerce initiated its investigation of AJC production from the PRC in June 1999, in response to a petition filed by several domestic manufacturers, all of which are defendant-

intervenors herein.[1] As in previous investigations, Commerce treated the PRC as a nonmarket economy country. See Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Non-Frozen Apple Juice Concentrate From the P.R.C., 64 Fed. Reg. 65,675, 65,677 (Nov. 23, 1999) ("Preliminary Determination"), amended by Non-Frozen Apple Juice Concentrate From the P.R.C.: Notice of Amended Preliminary Determination, Postponement of Final Determination and Extension of Provisional Measures, 64 Fed. Reg. 72,316 (Dec. 27, 1999) ("Amended Preliminary Determination").

Commerce issued its preliminary affirmative determination of sales at less than fair value in November 1999. Thereafter, Plaintiffs[2] objected that Commerce had committed several ministerial errors within the meaning of 19 C.F.R. § 351.224(f), in its calculation of: (1) overhead; and selling, general, and administrative expense ratios for all respondents; and (2) ocean freight value for respondent Lakeside Fruit Juice. See Amended Preliminary Determination, 64 Fed. Reg. at 72,317. After considering Plaintiffs' objections Commerce concluded that, while it did indeed make certain ministerial errors, only the errors with respect to Lakeside Fruit Juice were significant within the meaning of 19 C.F.R. § 351.224(g) and, hence, only those errors required correction. See id. As a result, Commerce sought to correct those

---

[1] The defendant-intervenors are Coloma Frozen Foods, Inc., Green Valley Packers, Krouse Foods Cooperative, Inc., Mason County Fruit Packers Co-Op., Inc., and Tree Top, Inc. (collectively "Defendant-Intervenors").

[2] Nine of the 11 respondents in the investigation conducted by Commerce are plaintiffs in this action. Each of these plaintiffs alleged that Commerce made ministerial errors. See Amended Preliminary Determination, 64 Fed. Reg. at 72,317.

errors, amended its preliminary determination, and changed the deposit rate assessed on Lakeside Fruit Juice's merchandise.

Commerce published the Final Determination on April 13, 2000. On April 24, 2000 Plaintiffs alleged ministerial errors in Commerce's final margin calculations. Commerce determined that a ministerial error had been made in calculating the international freight surrogate value and revised the final weighted-average dumping margins accordingly. See Amended Final Determination, 65 Fed. Reg. at 35,606. Following publication of the Amended Final Determination, and of the United States International Trade Commission's affirmative determination that an industry in the United States was threatened by material injury by reason of imports of AJC, an antidumping duty order was entered giving each respondent a separate anti-dumping duty margin.[3] See Final Determination, 65 Fed. Reg. at 19,873. Thereafter, Plaintiffs commenced this action.

---

[3] Commerce directed the United States Customs Service to revise the final weighted-average dumping margins as follows: Yantai Oriental, 9.96 percent; Nannan, 25.55 percent; Lakeside Fruit Juice, 27.57 percent; Haisheng, 12.03 percent; Zhonglu, 8.98 percent; Fuan,14.88 percent; Changsha Industrial, 14.88 percent; Shandong Foodstuffs, 14.88 percent; Asia, 14.88 percent. See Amended Final Determination, 65 Fed. Reg. at 35,606.

### DISCUSSION

By their motion, Plaintiffs challenge the following aspects of the Final Determination: (1) Commerce's selection of various surrogate factors of production including (A) Commerce's selection of India as the surrogate country for the PRC, (B) Commerce's selection of Indian prices to value juice apples, (C) Commerce's valuation of ocean freight expenses, (D) Commerce's valuation of steam coal, (E) Commerce's valuation of selling, general, and administrative expenses; and factory overhead, and (F) Commerce's inclusion of Detroit freight costs in its east coast surrogate freight calculation; and (2) Commerce's failure to amend ministerial errors contained in the Preliminary Determination. (See Pls.' Mem. Supp. Mot. J. Agency R. ("Pls.' Mem.").)

In order for the court to sustain the Final Determination it must find that the conclusions contained therein are supported by substantial evidence and otherwise in accordance with law. See 19 U.S.C. § 1516a(b)(1)(B)(I). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison v. United States, 305 U.S. 197, 229 (1938); Daewoo Elecs. Ltd. v. United States, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (quoting Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 932 (Fed. Cir. 1984). In reviewing an agency's findings the court must determine "whether the evidence and reasonable inferences from the record support the [agency's] finding." Daewoo, 6 F.3d at 1520 (quoting Matsushita, 750 F.2d at 933). "The question is whether the record adequately supports the decision of the [agency], not whether some other inference could reasonably have been drawn." Id. Finally, "the possibility of drawing two inconsistent conclusions from the evidence

does not prevent an administrative agency's finding from being supported by substantial

evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966); Daewoo, 6 F.3d at 1520

(quoting Matsushita, 750 F.2d at 933).  However, "[C]ommerce must articulate a 'rational

connection between the facts found and the choice made.'" Rhodia, Inc. v. United States, 25 CIT

__, __, 185 F. Supp. 2d, 1343, 1348 (2001) (quoting Burlington Truck Lines, Inc. v. United

States, 371 U.S. 156, 168 (1962), and remanding for reconsideration Commerce's calculation of

normal value using surrogate overhead costs where Commerce had not explained its reasons for

finding PRC aspirin producers to be more integrated than Indian surrogates).


I.       Factors of Production

         To determine whether subject merchandise is being, or is likely to be, sold in the United

States at less than fair value, Commerce must make "a fair comparison . . . between the export

price or constructed export price and normal value."[4]  19 U.S.C. § 1677b(a) (1994); 19 C.F.R. §

351.401(a) (1998).  Where, as here, the subject merchandise is exported from a nonmarket

economy country ("NME"),[5] Commerce is directed by statute to calculate normal value "on the

---

[4]       Normal value has been summarized as follows:

          Commerce generally calculates the antidumping duty by comparing
          an imported product's price in the United States to its normal
          value . . . , which represents the price of comparable merchandise
          in the exporting country.  The dumping margin is the amount by
          which [normal value] exceeds the US price.

Ta Chen Stainless Steel Pipe, Ltd. v. United States, 23 CIT 804, 806 n.2, (1999) (internal
citations omitted).

[5]       A NME country is defined by the antidumping statute as "any foreign country that
the administering authority determines does not operate on market principles of cost or pricing

basis of the value of the factors of production utilized in producing the merchandise . . . ." 19

U.S.C. § 1677b(c)(1);[6] 19 C.F.R. § 351.408(a).  When valuing factors of production in NME

circumstances, subsection 1677b(c) directs Commerce to gather surrogate prices from the "best

---

structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A) (1994).  "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority." 19 U.S.C. § 1677(18)(C).  Commerce's designation of the PRC as a NME country is not disputed.

> [6]      The statute provides:
>
> (c)      Non-market economy countries
>
> >    (1)      In general
> >
> >    If—
> >
> > >    (A)      the subject merchandise is exported from a nonmarket economy country, and
> > >
> > >    (B)      the administering authority finds that available information does not permit the normal value of the subject merchandise to be determined . . .
> >
> >    the administering authority shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. . . . [T]he valuation of factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c)(1).  "Thus, 'Commerce's task in a nonmarket economy investigation is to calculate what a producer's costs or prices would be if such prices or costs were determined by market forces.'"  Union Camp Corp. v. United States, 22 CIT 267, 270, 8 F. Supp. 2d 842, 846 (1998) (quoting Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 931, 940, 806 F. Supp. 1008, 1018 (1992)).

available information . . . in a market economy country . . . considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1)(B); see Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("Whether such analogous information from the surrogate country is 'best' will necessarily depend on the circumstances, including the relationship between the market structure of the surrogate country and a hypothetical free-market structure of the NME producer under investigation."). This being the case, "the process of constructing foreign market value for a producer in a [NME] is difficult and necessarily imprecise." Sigma Corp. v. United States, 117 F.3d 1401, 1408 (Fed. Cir. 1997). Commerce enjoys wide discretion in valuing factors of production. See Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994); see also Sigma, 117 F.3d at 1405 ("Commerce . . . has broad authority to interpret the antidumping statute . . . ." (citing Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995)). However, Commerce's discretion in calculating surrogate prices is not limitless. See H.R. Conf. Rep. No. 100-576, at 590, reprinted in 1988 U.S.C.C.A.N. 1547, 1623 ("Commerce shall avoid using any prices which it has reason to believe or suspect may be . . . subsidized prices."); see also Shakeproof Assembly Components, Div. of Ill. Toolworks, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("In determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible.").

### A. Surrogate Country

Plaintiffs' first objection concerns Commerce's selection of India as the surrogate market economy country. Plaintiffs argue that India has not been shown by substantial evidence on the record to be a "significant producer" of AJC within the meaning of 19 U.S.C. § 1677b(c)(4)[7] because, in making its determination, Commerce relied on: (1) data contained in a private market study prepared for Petitioners by a paid consultant (see Petitioners Valuation Submission of 2/28/00, Pub. R. Doc. 242, Ex. 2 ("Market Study")); and (2) data relating to AJC production from a single government-controlled company in India, Himachal Pradesh Horticultural Produce Marketing & Processing Corp. ("HPMC"). In addition, Plaintiffs urge the court to reject "the Department's attempt to place the burden on the respondents to disprove the validity of information gathered by a paid consultant . . . ." (Pls.' Mem. at 18.)

---

[7] This subsection provides:

The administering authority, in valuing factors of production under paragraph (1), shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—

(A) at a level of economic development comparable to that of the nonmarket economy country, and

(B) significant producers of comparable merchandise.

For its part, the United States ("Government"), on behalf of Commerce, asserts that it found substantial evidence on the record to conclude that India was a significant producer of comparable merchandise:

> In reaching our conclusion, we have first considered what would constitute "comparable merchandise." We believe that, for purposes of this investigation, AJC and SSAJ [single strength apple juice] are comparable. Both are made from the same basic input (juice apples) and the only difference is the extent to which the juice is concentrated. Furthermore, we share the petitioners conclusion that countries with significant apple production are also likely to have significant AJC/SSAJ production.
>
> According to the petitioners' market study, total AJC production in India reached over 1,500 metric tons ("MT") in 1998/99 and total SSAJ production was at approximately the same level.[8] As the tenth largest apple growing country in the world, India is a significant producer of apples. Also, the petitioners' market study describes numerous producers of AJC/SSAJ in India.[9] While we acknowledge that there is no official country-wide data regarding AJC/SSAJ production in India, the respondents have not provided information that leads us to reject this market study. Finally, there is record evidence of at least one significant producer of comparable merchandise in India, HPMC. This company's 1998/99 annual report shows that it processed over 10,500 MT of apples in 1998/99, part of which was used to produce AJC. We find that this is sufficient evidence to support a conclusion that India is a significant producer of comparable merchandise.

(Issues and Decision Memorandum for the Final Determination in the Antidumping Duty

Investigation of Certain Non-Frozen Apple Juice Concentrate from the P.R.C. of 4/6/00 ("Issues

---

8       The court could find no mention of SSAJ production in Petitioners' Market Study. (See generally Market Study.)

9       In fact, Petitioners' Market Study identifies five companies that could have produced AJC during the POR.  (See Market Study at 7.)  The study identifies no companies capable of producing SSAJ.  As to which companies actually produced AJC during the POR, the study names companies which at no point are identified as capable of doing so.  (Id. at 12.)

and Decision Mem.”), Pub. R. Doc. 271 at 4.)  The court finds that Commerce's conclusion is

not in accordance with law or based on substantial evidence on the record.

        First, Commerce's use of the Petitioners' Market Study is not in accordance with law.

Where Commerce is presented with secondary information, to the extent practicable, it is

required to corroborate that information in order to evaluate its probative value:

> When the administering authority or the Commission relies on
> secondary information rather than on information obtained in the
> course of an investigation or review, the administering authority or
> the Commission, as the case may be, shall, to the extent
> practicable, corroborate that information from independent sources
> that are reasonably at their disposal.

19 U.S.C. § 1677e(c) (1994); see also World Finer Foods, Inc. v. United States, 24 CIT __, __,

Slip Op. 00-72 at 15–16 (2000) (“The Statement of Administrative Action ('SSA') further

clarifies that 'secondary information may not be entirely reliable' and that '[c]orroborate means

that the agencies will satisfy themselves that the secondary information to be used has probative

value.'” (quoting SAA accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-

826(I) at 870, reprinted in 1994 U.S.C.C.A.N. at 4199)).  Here, Commerce nowhere indicated on

the record why it found the Petitioners' Market Study[10] to be probative of the Indian AJC

industry as a whole.  Rather, Commerce merely adopted Petitioners' representations and stated

that “respondents have not provided information that leads us to reject this market study.”  This

---

[10]        An examination of Petitioners' Market Study reveals that some of its conclusions
are based on information from the “National Horticultural Board.”  (See Market Study at 1.)
Most of the study's conclusions, however, bear no citations as to the sources used in reaching
them.  Commerce does not indicate why it considered Petitioners' Market Study to be reliable or
state that it made any effort to corroborate that the study accurately represented Indian AJC
production.

statement, however, does nothing to enhance the probative value of Petitioners' Market Study or

lessen the burden of corroborating secondary information, which falls squarely on Commerce.

Second, Commerce's conclusion, based on Petitioners' Market Study, that India was a

"significant producer" of AJC is not supported by substantial evidence on the record. When

drawing inferences from the facts on the record Commerce may not rest its decisions on

conclusory statements. Rather, Commerce must "articulate a 'rational connection between the

facts found and the choice made.'" Rhodia, Inc., 25 CIT at __, 185 F. Supp. 2d at 1348. Here,

Commerce made no such connection but merely adopted the conclusions from Petitioners'

Market Study without explaining how such conclusions were justified by facts. For example,

Commerce's statement that "we share the petitioners' conclusion that countries with significant

apple production are also likely to have significant AJC/SSAJ[11] production" is devoid of an

explanation. Thus, because Commerce did not adequately explain the connection between the

data and conclusions found in Petitioners' Market Study, and Commerce's own conclusion that

India was a "significant producer of comparable merchandise" such conclusion is not supported

by substantial evidence.

---

[11]     With respect to SSAJ production, Commerce apparently took the supposed
conclusion from Petitioners' Market Study "that countries with significant apple production are
likely to have significant AJC/SSAJ production" and assumed that SSAJ production during the
POR would equal the amount of AJC production claimed by Petitioners (i.e. 1,500 MT), thus
doubling the amount of "comparable merchandise" produced by India and making such
production more "significant." As noted previously, Petitioners' Market Study does not mention
SSAJ.

Finally, Commerce's finding that HPMC's annual report provided sufficient evidence that India was a significant producer of AJC is not supported by the record. As part of its finding that India was a significant producer of AJC during the POR Commerce stated:

> Finally, there is record evidence of at least one significant producer of comparable merchandise in India, HPMC. This company's 1998/99 annual report shows that it processed over 10,500 MT of apples in 1998/99, part of which was used to produce AJC.

(Issues and Decision Mem., Pub. R. Doc. 271 at 4.) Using HPMC's annual report, Commerce appears to have concluded that if HPMC processed 10,500 MT of apples, and if some unstated percentage of that production was given over to AJC production, it was a reasonable inference that the Indian apple processing industry as a whole was a significant producer of AJC.[12] This conclusion would follow only if it were shown that either: (1) HPMC produced most of the AJC in India and such output was significant; or (2) significant production of AJC by other Indian producers could be extrapolated from the HPMC information. However, Commerce does not explain how, based on HPMC's annual report, it arrived at its conclusion that India was a "significant producer of comparable merchandise" and, thus, because it has not articulated a rational connection between the two, its findings are not supported by substantial evidence.

Therefore, the court finds that Commerce's conclusion that India is a "significant producer of comparable merchandise" is not in accordance with law or supported by substantial evidence on the record. On remand Commerce shall fully explain the reasoning for its selection of the surrogate country and in particular: (1) the steps it took to corroborate the claimed facts

---

[12] Plaintiffs note that Commerce "does not even quantify HPMC's production of AJC." (Pls.' Mem. at 19.)

found in Petitioners' Market Study; (2) the connection between the claimed facts and conclusions found in Petitioners' Market Study and Commerce's conclusion that India was a significant producer of AJC, particularly with respect to (a) AJC production and (b) AJC production and SSAJ production; and (3) the reasoning it used connecting HPMC's annual report and such conclusion. In the event Commerce concludes that it is unable to develop sufficient credible evidence of India's suitability as the surrogate market economy country for AJC production, Commerce shall select another suitable country to complete its review and timely alert the court of its decision to do so.

### B.     Apple Valuation

Next, the court examines whether the value of 2.25 Rupees ("Rs") per kilogram for the production factor, i.e. juice apples, was a "market derived price" actually paid by an Indian AJC producer, and thus an appropriate surrogate value for PRC juice apples. (See Issues and Decision Mem., Pub. R. Doc. 271 at 7–9.)

Plaintiffs maintain that even if India were the proper surrogate market economy for purposes of valuing factors of production, Commerce's use of Indian prices to determine the appropriate value for juice apples was improper.[13] (See Pls.' Mem. at 26.) Plaintiffs' main

---

[13]     Plaintiffs argue that the Department should not have used Indian prices for apples, but rather Turkish prices. (See Pls.' Mem. at 26–28.) In short, Plaintiffs contend that Turkish juice apple price data is more appropriate than Indian price data for purposes of valuing this factor of production because: (1) "Turkish data represented prices from three public commodities exchanges in three different regions in Turkey, thereby allowing the Department to account for the effects of seasonality on prices at the beginning and end of the season, when supply is low and prices are high" (id. at 27); and (2) "Turkish data is exactly contemporaneous with the

contention is that "the primary raw material input in making AJC—juice apples—was influenced by a 'Market Intervention Scheme' (or 'MIS') whereby the Indian national and provincial governments artificially raised the prices of apples in order to provide a subsidy to the apple growers."  (Pls.' Mem. at 22.)

During the course of the investigation, however, Commerce rejected the characterization of the MIS as an unacceptable subsidy program:

> [T]he Department is primarily concerned with subsidies that enable producers to lower their prices to a point where the prices no longer reflect a fair market value.  This is not the case with the MIS program, which may provide a subsidy to Indian producers of apples but which, if anything, raises the prices of juice apples to Indian AJC producers as a result of the floor price established by the program.  Second, as the petitioners have pointed out, the MIS program applies only to a small portion of India's total apple crop.  Third, the 2.25 Rs/kg price that the Department is using is not the MIS price the growers receive, but a market-derived price actually paid by an India producer of AJC.

(Issues and Decision Mem., Pub. R. Doc. 271 at 9 (emphasis added).)  Thus, the Government contends that Commerce properly found that the MIS did not automatically render Indian prices unusable for purposes of selecting surrogate values for juice apples.  Commerce concluded that the MIS did not "disturb[ ] the fair market value of Indian apples for purposes of valuation" (Def.'s Resp. to Pls.' Mem. Supp. Mot. J. Agency R. ("Def.'s Resp.") at 17 (citing Preliminary

POR . . . ." (Id.)

In finding preliminarily that India and not Turkey was to be the appropriate surrogate country Commerce stated: "First, we note that India is economically comparable to the PRC, while Turkey is not.  Second, we have been able to develop publicly available factor values in India without relying on proprietary information submitted by the petitioners."  Preliminary Determination, 64 Fed. Reg. at 65,679 (emphasis added).

Determination, 64 Fed. Reg. at 65,679)) and that the 2.25 Rs/kg price was a "market-derived price actually paid by HPMC for juice apples during the [POR]." (Def.'s Resp. at 19.) Thus, the Government argues, such values were appropriate to use.

This conclusion is difficult to credit. Commerce's position does not appear to take into account that a government program that raises the value of a factor of production would necessarily raise normal value to Plaintiffs' disadvantage. Here, the program established a floor price for juice apples, 2.25Rs/kg. As noted above, Commerce concedes that the MIS "if anything, raises the prices of juice apples . . . ." (Issues and Decision Mem., Pub. R. Doc. 271 at 9.) Indeed, the Government does not argue otherwise, but explains that its primary concern is "with subsidies that enable producers to lower their prices to a point where the prices no longer reflect a fair market value" (id.), and that "the Department therefore 'draws a line' with government subsidies that tend to enable producers to lower their price to the point where they (the prices) may not reflect fair market value. In such cases, the Department considers alternative factor price data." Preliminary Determination, 64 Fed. Reg. at 65,679. Thus, it is Commerce's policy to seek alternative factor price data if the value of a factor is lowered by a subsidy, but not if the value of the factor is raised. As Commerce's explanation fails to "articulate a 'rational connection between the facts found and the choice made,'" Rhodia, Inc., 25 C.I.T. at __, 185 F. Supp. 2d at 1348, or demonstrate its conclusion to be one that represents an effort to establish antidumping margins "as accurately as possible," Shakeproof, 268 F.3d at 1382, its conclusion is neither supported by substantial evidence nor in accordance with law.

As to the Government's claim that the 2.25 Rs/kg price "is not the MIS price the growers receive, but a price actually paid by an Indian producer of AJC," this conclusion is not borne out by the evidence on the record. HPMC, the Indian producer of AJC on whose data Commerce relied in determining the value of juice apples, is a government controlled company that administers the MIS by purchasing apples to stabilize prices.[14] In addition, HPMC has not historically made a profit, and its losses are made up by loans from the Himachal Pradesh state government and from other government sources. (See HPMC At A Glance, Pub. R. Doc. 90, Ex. C at 5.) Thus, HPMC activities do not appear to be market driven. HPMC itself cites several reasons for its yearly losses including "MIS has become the main activity of the Corporation" (id.) and "the high cost of processing grade apples @ Rs. 2.25 per kg. add to the higher cost of Apple Juice Concentrate and the Corporation is becoming incapable of competing in international market . . . . In fact, this component itself over the last four years incurred losses to the tune of Rs. 4.61 Crores."[15] (Id. at 5–6.) Thus, it is questionable whether the price "actually paid" by such company is a market-derived price. On this issue Commerce states that "Despite a certain level of government involvement in the Indian economy, it is the Department's longstanding practice to treat most Indian prices and costs as market-determined under the anti-dumping law." (Issues and Decision Mem., Pub. R. Doc. 271 at 9.) The issue, though, is not the Indian government's generalized involvement in the economy. Rather, the issue here is the

---

[14] HPMC, "in 1996–97 [became] a fully owned Government Company." (See HMPC's 25th Annual Financial Report For Year 1998–99, Pub. R. Doc. 238, Ex. D at D-1; see also HPMC At A Glance, Pub. R. Doc. 90, Ex. C at 3 (stating HPMC administers the MIS to stabilize prices).)

[15] A single "Crore" is equivalent to 10,000,000 rupees.

particular distortions resulting from the MIS, which Commerce did not to take into account when valuing juice apples. In this regard, it is impossible to ignore the result that the floor price set by the MIS is exactly the same as the price Commerce claims to be the "free market price." Therefore, because the evidence on the record indicates that the MIS is a subsidy tending to increase the price paid for juice apples, and that the HPMC purchase of juice apples at 2.25 Rs/kg is not market driven but an inflated price that HPMC paid as part of the MIS, the conclusion that the amount HPMC paid for juice apples was a market derived price is not supported by substantial evidence on the record.

On remand, Commerce shall fully explain, (1) why the distortions caused by the MIS "did not disturb the fair market value of Indian apples for purpose of valuation," (2) fully explain its policy of taking into account only "government subsidies that tend to enable producers to lower their price to the point where they (the prices) may not reflect fair market value" and not those that tend to raise prices with the same result, and (3) why HPMC, as a government controlled entity that administered the MIS to its detriment, should be considered to have paid "a market derived price" for its apples.

### C.      Ocean Freight Expenses Valuation

Plaintiffs' next claim is that Commerce did not sufficiently justify its use of surrogate ocean freight expenses. In its Final Determination Commerce used a surrogate rate rather than accepting Plaintiffs' documentation of the amount they paid for ocean freight expenses. According to Plaintiffs, in response to Commerce's regulations for valuing factors of production,

they supplied the actual amount paid for ocean freight costs because their "goods were shipped by market economy companies and charges were incurred in a market economy currency." (Pls.' Mem. at 11.) Plaintiffs urge that the proof they submitted comports with Commerce's policy that, in the context of a NME, "where a factor is purchased from a market economy supplier and paid for in market economy currency, the Secretary will normally use the price paid to the market economy supplier." 19 C.F.R. § 351.408(c)(1).[16] Plaintiffs make no objection to the regulation itself, rather, they claim that the invoices presented satisfy the regulation's requirements.

Commerce, however, reviewed the proffered proof of payment and found it unacceptable because, although Plaintiffs' payment was made in a market economy currency, it was made to a PRC freight forwarder rather than to the market economy carrier. Thus, as Defendant-Intervenors point out, Commerce concluded: "In this case, nonmarket respondents offered documentation of payment to another nonmarket entity, here a freight forwarder. However,

---

[16]     Subsection 351.408(c)(1) provides:

> For purposes of valuing the factors of production, general
> expenses, . . . and other expenses under [19 U.S.C. § 1677b(c)(1)]
> the following rules apply:
>
> > (1)     Information used to value factors. The
> > Secretary normally will use publicly
> > available information to value factors.
> > However, where a factor is purchased from a
> > market economy supplier and paid for in a
> > market economy currency, the Secretary
> > normally will use the price paid to the
> > market economy supplier.

19 C.F.R. 351.408(c)(1).

Plaintiffs failed to provide the Department with any evidence of transactions between the PRC

freight forwarder and the market-economy ocean carriers used to transport the merchandise."

(Def.-Intervenors' Resp. to Pls.' Mem. Supp. Mot. J. Agency R. at 20–21 (emphasis in original).)

In order to determine the value of this factor, Defendant-Intervenors claim, Commerce must have

"documentation of the actual purchase from the market economy supplier." (Id. at 21.) In other

words, Commerce and Defendant-Intervenors demand documentation of the amount actually

paid to the shipping company, and not just proof of the amount paid to the freight forwarder.


Plaintiffs assert that all the regulation requires is that an input be (1) "purchased from a

market economy supplier" and (2) "paid for in a market economy currency" and that they

satisfied both requirements. Plaintiffs ignore, however, the regulation's injunction that "the

Secretary will normally use the price paid to the market economy supplier." 19 C.F.R. §

351.4085(c)(1) (emphasis added). Thus, under the regulation, merely establishing that the factor

was purchased from a market economy supplier is not enough; rather, the amount paid to the

supplier must be documented. Indeed, Plaintiffs agree that the "stated rationale for the market

economy input rule is to use those costs for a respondent 'determined by market forces' in order

to promote accuracy and fairness" (Pls.' Mem. at 35 (citation omitted)) but offer no convincing

reason why a transaction between two nonmarket entities would be determined by market forces.

While Plaintiffs cite several instances[17] where Commerce has considered transactions involving a

---

[17]        For instance, Plaintiffs cite Notice of Final Determination of Sales at Less Than
Fair Value: Bulk Aspirin From the P.R.C., 65 Fed. Reg. 33,805 (May 25, 2000) as supporting
their position. In Bulk Aspirin, Commerce rejected respondent's ocean freight expenses
"because the freight forwarder invoices provided by the respondents only evidenc[ed] the amount
charged by the market economy carrier to the freight forwarder." (Pls.' Mem. at 36 (citing Bulk

freight forwarder, they have not identified one in which Commerce has accepted a transaction between two nonmarket entities as proof of the cost of ocean freight expenses. Therefore, Commerce's conclusion is not a departure from past practice and is in accordance with its regulations. Because both the Plaintiffs and the freight forwarder do business in a nonmarket economy country which "does not operate on market principles," see 19 U.S.C. § 1677(18)(A), it hardly seems unreasonable that proof of what was paid to a market economy supplier should be used to substantiate that the amount paid for this factor was "determined by market forces." Absent this, Commerce is justified in its use of a surrogate freight price. Thus, Commerce's valuation of ocean freight expenses is in accordance with law.

### D. Steam Coal Valuation

Plaintiffs' next objection is that in its valuation of steam coal as a factor of production, Commerce erred in using data for coal imported by India rather than domestically produced coal. In support of their objection, Plaintiffs contend "the record . . . contains no evidence that the domestic coal price in India is inaccurate or distorted. To the contrary, the facts indicate that the import price is unrealistic for AJC producers because they have no need to purchase the higher-priced imported coal." (Pls.' Mem. at 41.)

---

Aspirin, 65 Fed. Reg. 33,805 (Issues and Decisions Memorandum comment 8)).) What Bulk Aspirin demonstrates, however, is that in order for a transaction to be market based, both the amount paid by the nonmarket entity and the amount charged by the market economy supplier must be documented.

The Government contends that Commerce's use of imported coal data from the Monthly Statistics[18] was justified because the "information was deemed the most contemporaneous with the POR." (Def.'s Resp. at 25–26.) The Government also argues that "the Department found that the . . . data provided a more accurate surrogate value of coal costs than the resource[19] offered by plaintiffs." (Id. at 26.) Finally, the Government asserts that "[t]his Court has stated that the Department need not duplicate the exact production experience of the [Chinese] manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value [of the subject merchandise] in a market economy." (Def.'s Resp. at 26–27 (citing Nation Ford, 166 F.3d at 1377).) The court does not agree that this reasoning adequately supports Commerce's conclusion.

In support of its valuation of steam coal, Commerce stated:

> In this case, we find that because the 1997/98 Monthly Statistics information is more contemporaneous with the [POR], it is a more appropriate surrogate than the 1996 EP&T data. There is no evidence on the record to suggest that the Monthly Statistics data is aberrational or unreliable. Furthermore, the courts have stated that the Department is not required to use domestic prices solely

---

[18]    2 Directorate General of Commercial Intelligence & Statistics, Ministry of Commerce, Government of India, Monthly Statistics of Foreign Trade of India (1998).

[19]    Plaintiffs' proposed source, Energy Prices and Taxes is published by the Organisation for Economic Co-Operation and Development. (See Valuation of Factors of Production, Pub. R. Doc. 266, Ex. 17; see also Pls.' Reply, Ex. 5.) This periodical "provides OECD country statistics on energy prices and taxes for all energy sources and main consuming sectors. The data system responds to the need identified by International Energy Agency (IEA) Energy Ministers for improved information on national and international energy markets and attempts to meet the requirements of those involved in international energy issues." See http://www.oecdwash.org /PUBS/PERIOD/per-ept.htm (last visited June 6, 2002).

because they are available, but instead it should use the "best
available information."

(Issues and Decision Mem., Pub. R. Doc. 271 at 12–13 (citing Nation Ford, 166 F.3d at 1377).)

Commerce's discussion, however, fails to explain why its use of imported coal data "best

approximate[s]" the cost of coal incurred by Indian AJC producers during the POR. Nation Ford,

166 F.3d at 1376. While the data relied upon by Commerce may be "more contemporaneous"

with the POR and not "aberrational or unreliable," these facts do not naturally lead to the

conclusion that such data is an accurate reflection of the price paid for coal by domestic Indian

AJC producers during the POR. Commerce nowhere explains how the use of seemingly more

expensive imported coal data is the best available information establishing the actual costs

incurred by Indian AJC producers.

The Government relies on Nation Ford to support its position. This reliance is misplaced

and indeed, that case tends to bolster Plaintiffs' position. In Nation Ford the Court of Appeals

for the Federal Circuit found that Commerce's selection of imported aniline data was reasonable

because, as a result of a tariff provision, Indian sulfanilic acid producers purchased imported

(rather than domestic) aniline when producing sulfanilic acid for export.[20] The court found that

the "'values [selected] best approximate the cost incurred by the sulfanilic acid exporters in

---

[20]      The court explained "India protected its domestic aniline industry from global
competition with an 85% import tariff, and . . . this tariff caused the price of domestically-
produced aniline to be inflated. . . . [T]his tariff, however, was not paid by Indian sulfanilic acid
producers if they used the aniline to produce sulfanilic acid for export. Not surprisingly, Indian
sulfanilic acid producers who exported their product bought imported aniline instead of domestic
aniline . . . ." Nation Ford, 166 F.3d at 1375.

India . . . .'" Nation Ford, 166 F.3d at 1376 (citation omitted).  Here, Commerce has produced no

evidence tending to lead to the conclusion that India's domestic AJC producers would use

imported as against domestic coal.


Thus, the court cannot find Commerce's conclusion that imported steam coal data is the

"best available information" is supported by the record because: (1) there is no indication that the

domestic Indian coal market was distorted in the manner the domestic sulfanilic acid market was

in Nation Ford such that the use of import data was preferred; and (2) there is no indication that

the use of imported coal values "best approximate the cost incurred" for Indian AJC production.

Therefore, this issue is remanded for Commerce to either: (1) recalculate normal value using the

domestic coal data provided by Plaintiffs; or (2) provide an explanation of why the use of

domestic coal data (adjusted for inflation or deflation if necessary) would not more accurately

approximate the experiences of Indian AJC procedures during the POR.


### E.        SG&A and Factory Overhead Valuation

Next, Plaintiffs challenge Commerce's decision to rely on the "1992–93 [financial]

data [taken] from the . . . Reserve Bank of India Bulletin, January 1997" ("RBI"), Preliminary

Determination, 64 Fed. Reg. at 65,680, in the calculation of selling general and administrative

expenses[21] ("SG&A"), and overhead ratios.  Plaintiffs contend that "Commerce's decision to

disregard the 1998–99 audited financial data of the largest known Indian AJC producer [HPMC]

---

[21]        SG&A "is a ratio of general expenses to the cost of manufacturing."  Magnesium Corp. of Am. v. United States, 166 F.3d 1364, 1371 (Fed. Cir. 1999) (citing Magnesium Corp. of Am. v. United States, 20 CIT 1092, 1104, 938 F. Supp. 885, 898 (1996)).

in favor of a general 'basket category' of financial data from 1992–93 is unsupported by the regulations . . . and the evidence and facts on [the] record." (See Pls.' Mem. at 28.) Plaintiffs urge that Commerce should have used HPMC's 1998–99 financial data, because the RBI data was six years older than HPMC's financial data, and was taken from "multiple and unrelated industries." (See id. at 31.) Plaintiffs, further, contend that it was inconsistent for Commerce to rely on HPMC's 1998–99 financial statements in selecting India as the surrogate country and in valuing juice apples, while simultaneously rejecting such data for calculating surrogate SG&A expenses and overhead ratios.

The Government disputes Plaintiffs' contentions and argues that Commerce correctly determined that it could not use HPMC's 1998–99 financial data for surrogate SG&A expenses and overhead ratios. On this point, Commerce stated:

> HPMC was the largest producer of the subject merchandise in India, but the record indicates that as much as eighty (80) percent of its revenues came from activities other than the production of fruit juice. Although the Department was able to rely upon HPMC's data for the price of juice apples, the Department determined that it could not rely upon HPMC for overhead and SG&A expenses because its expenses would not be representative of the overhead and SG&A expenses that would be incurred by a PRC AJC producer.

(Def.'s Resp. at 28.)

In determining normal value for an exporter from a NME country Commerce's regulations offer some guidance with respect to the valuation process. Specifically, subsection 351.408(c) of the Code of Federal Regulations provides, that for valuing "manufacturing

overhead, general expenses, and profit, the Secretary normally will use nonproprietary

information gathered from producers of identical or comparable merchandise in the surrogate

country." 19 C.F.R. § 351.408(c)(4). In this case, however, rather than use "data from [an] actual

producer[] of [the] subject merchandise in the surrogate country" (Issues and Decision Mem.

Pub. R. Doc. 271 at 16), namely HPMC, Commerce relied on more generalized RBI data,

because it believed "that the RBI data [was] the best information on the record to value SG&A,

overhead, and profit." (Id.) In turning to the RBI data, Commerce was primarily concerned that:

> AJC production consists of a relatively small portion of HPMC's
> total revenues[22], and that the total revenues of HPMC are
> primarily derived from service-oriented rather than manufacturing
> operations. In contrast, the RBI data used at the preliminary
> determination is derived from manufacturing industries, including
> those involved in the production of food products.

(Issues and Decision Mem., Pub. R. Doc. 271 at 16.)


Thus, the issue for the court is whether Commerce acted within its discretion when it

disregarded the financial data contained in AJC producer HPMC's publicly available annual

report and relied, instead, on more generalized RBI data in calculating SG&A expenses and

overhead ratios. The record does not support Commerce's decision. Commerce's regulation

provides that it "normally" will rely on "nonproprietary information gathered from producers of

identical or comparable merchandise in the surrogate country." 19 C.F.R. § 351.408(c)(4).

Commerce followed this practice when using the financial data of an Indian AJC producer, i.e.,

---

[22]     Commerce does not relate this statement to expenses, which are the primary concern here, or to HPMC's statement that "MIS has become the main activity of the Corporation . . . ." (HPMC At A Glance, Pub. R. Doc. 90, Ex. C at 5.)

HPMC, for purposes of seeking the surrogate market economy and proper value of juice apples. For purposes of estimating SG&A expenses and overhead ratios, however, Commerce rejected the use of the financial data from HPMC—an entity it concluded was a producer of comparable merchandise. Instead, Commerce relied on more generalized RBI data, which was: (1) dramatically more outdated than the data Commerce rejected when seeking data with which to value the factor steam coal; and (2) appears to bear little relationship to the actual costs incurred by an Indian AJC producer. Though Commerce's claim—that HPMC's financial data may not accurately reflect the SG&A expenses and overhead ratios of an Indian AJC producer—may be relevant, Commerce has nowhere stated that it made an examination of HPMC's financial data to determine if reliable SG&A expenses and overhead ratios could be calculated. Indeed, Plaintiffs not only argue that HPMC's financial data sufficiently detailed to make SG&A expenses and overhead ratios, they have submitted evidence, taken from the record, tending to establish the adequacy of this financial data for these purposes. (See Respondents' Additional Surrogate Information, 2/25/00, Pub. R. Doc. 238 Ex. D–E.)[23]

Therefore, the court finds that Commerce's decision to value SG&A expenses and overhead ratios on the basis of more generalized RBI data is not supported by substantial

---

[23] For example, in Exhibit E Plaintiffs, using Commerce's methodology, calculated SG&A expenses and overhead ratios based on HPMC's financial data. (Respondents' Additional Surrogate Information, 2/25/00, Pub. R. Doc. 238, Ex. D at D-7, Ex. E ("In the event that [Commerce] continues to use India as a surrogate country, the HPMC financial report can be used to calculate ratios for factory overhead and SG&A expenses. In that regard, we attach as Exhibit E a calculation of the factory overhead and SG&A ratios, using the same methodology used by [Commerce] in the Preliminary Determination."; see also Pls.' Mem. at 11 ("Based on the data contained in [HPMC's] audited 1998–99 financial report, [Plaintiffs] calculated factory overhead and SG&A ratios . . . .")).)

evidence on the record. On remand Commerce shall: (1) recalculate normal value using information from HPMC's financials; or (2) fully explain why it departed from its normal practice of relying on nonproprietary information gathered from producers of identical or comparable merchandise in a surrogate country for purposes of valuing SG&A expenses and overhead ratios; and in particular, Commerce shall: (a) fully explain why it rejected the use of the financial data of HPMC, an entity that Commerce concluded was a producer of comparable merchandise and, instead, relied on more generalized RBI data, and further (b) why the calculations made by Plaintiffs should not be used to value these factors.

### F.        East Coast Surrogate Freight Calculation

Finally, Plaintiffs dispute the calculation of east coast surrogate freight costs by the inclusion of "the cost of sending freight to Detroit, a city that is approximately 600 miles away from the East Coast." (Pls.' Mem. at 38). Plaintiffs claim that, "As noted in Respondents' submission, the Qingdao to Detroit freight rate was provided only to account for certain shipments made by one respondent to a port near Detroit . . . . All other east coast shipments from all respondents were made to coastal ports." (Pls.' Mem. at 39 (emphasis as in original).) Thus, Plaintiffs argue that three rates should have been established: (1) an east coast rate; (2) a west coast rate; and (3) a Detroit rate for those shipments made to that city. Plaintiffs further argue that including the cost of shipping to Detroit in either the east or west coast rates would unfairly increase these rates to Plaintiffs' disadvantage and "unnecessarily reduce[] the accuracy of the surrogate freight [rates.]" (Pls.' Mem. at 39.) The Government's only comment with

respect to Commerce's decision to include the Detroit costs in the east coast rate is to declare that

it would have been inappropriate to include the costs in the west coast rate:

> [T]here is little evidence in the documentation provided by the
> respondents supporting their claim that freight to Detroit is shipped
> via the West Coast. . . . Because of the contradictory and
> confusing information on the record, we included Detroit in the
> East Coast average because in the Department's experience, freight
> to that city normally goes via the east Coast.

(Def.'s Resp. at 36 (quoting Allegation of Clerical Errors in the Final Calculations Mem., Pub. R.

Doc. 295, Attach. at 4).) Plaintiffs' argument, however, is that the costs of shipping to Detroit

should not have been included in either the east or west coast averages (Pls.' Mem. at 39) and

that a separate rate should have been calculated for Detroit. (Id., n.12 ("Since the 'Port of

Importation' field (IMPORTU) in this respondent's U.S. Sales database submitted to Commerce

clearly indicated which sales were shipped to the Detroit area, Commerce was fully capable of

applying the Detroit freight rate to those particular sales while leaving the East Coast freight rate

unaltered for all other East [C]oast sales to coastal cities.").) "The inclusion of the Detroit freight

rate in the East Coast calculation does nothing but diminish the accuracy of this calculation (the

Detroit freight cost is 25% higher than the legitimate East Coast freight rates). Including the

Detroit rate in the West Coast calculation would be equally distortive." (Pls.' Reply Mem. at 13.)

In addition, Commerce, without explanation, failed to take into account the volume of freight

sent to each port, valuing the few shipments to Detroit equally to the many shipments to New

York. Thus, the east coast rate was skewed by Detroit's inclusion.

Since the Government failed to address Plaintiffs' seemingly reasonable argument at any

point in its papers and Commerce has similarly failed to address it at any point including in its

Final Determination, this matter is remanded for a fuller explanation of why a separate Detroit

rate should not be calculated.  On remand, Commerce shall specifically address Plaintiffs'

argument that a separate Detroit freight rate should be calculated and fully explain its reasons for

not doing so and, in addition, explain its policy of not weighting shipments to various

destinations so as to accurately reflect the volume of merchandise actually shipped to each

destination.


## II.      Ministerial Errors

Plaintiffs argue that "Commerce's failure to modify the deposit rates to correct its own

mistakes in the Preliminary Determination acted to deny U.S. importers the benefit of the

'Provisional Measures Deposit Cap' set forth in 19 U.S.C. 1673f(a)."[24] ("Capping Provision")

---

[24]      This subsection provides:

> If the amount of a cash deposit, or the amount of any bond or other
> security, required as security for an estimated antidumping duty
> under section [19 U.S.C. § 1673b(d)(1)(B)] is different from the
> amount of the antidumping duty determined under an antidumping
> duty order published under [19 U.S.C. § 1673e], then the
> difference for entries of merchandise entered, or withdrawn from
> warehouse, for consumption before notice of the affirmative
> determination of the Commission under [19 U.S.C. § 1673d(b)] is
> published shall be—
>
>      (1)     disregarded, to the extent that the cash
>              deposit, bond, or other security is lower than
>              the duty under the order, or
>
>      (2)     refunded or released, to the extent that the
>              cash deposit, bond, or other security is
>              higher than the duty under the order.

19 U.S.C. § 1673f(a) (amended 1996).  Thus, there is a cap on liability for payment of duties,

(Pls.' Mem. at 42.)  For its part, Commerce argues that its decision not to amend "insignificant Ministerial Errors Arising in the Preliminary Determination" was consistent both with its regulations and with the Capping Provision.  (Def.'s Resp. at 30); 19 C.F.R. § 351.224; 19 U.S.C. § 1673f(a).

Pursuant to the Capping Provision, liability for duties established by a final determination are set at the amount established by a preliminary determination such that if the cash deposit or bond amount set at the preliminary determination is different from the duty amount determined pursuant to the final antidumping duty order, then the difference will be "(1) disregarded, to the extent that the cash deposit, bond, or other security is lower than the duty under the order, or (2) refunded or released, to the extent that the cash deposit, bond, or other security is higher than the duty under the order." 19 U.S.C. § 1673f(a).  In other words, by making the deposit in the amount set by the Preliminary Determination, Plaintiffs capped their liability at the amount of the deposit, even if the duty amount in the Final Determination was higher.  In accordance with its regulations, however, Commerce makes corrections in a preliminary determination only when it finds a "significant ministerial error."  19 C.F.R. § 351.224(e).[25]  Plaintiffs claim that by refusing

equal to the amount of the cash deposit rate provided for by the preliminary determination, on merchandise entered between a preliminary determination and a final determination.

[25]     This subsection provides for correction of significant ministerial errors found in a preliminary determination.  "Ministerial error" means "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial."  19 C.F.R. § 351.224(f).  A ministerial error is significant when: "the correction of which, either singly or in combination with other errors: (1) Would result in a change of at least five absolute percentage points in, but not less than 25 percent of, the weighted-average dumping margin . . . calculated in the original (erroneous) preliminary determination; or (2) Would result in a

to correct all ministerial errors found in the <u>Preliminary Determination</u> the amount of their

deposit was greater than would otherwise have been the case, and that they have, therefore, been

denied "an important statutory right" to which the Capping Provision entitled them. (Pls.' Mem.

at 44.) Thus, Plaintiffs claim that Commerce must make adjustments, in the <u>Preliminary</u>

<u>Determination</u>, for all errors in the calculation of the rate and not just significant errors. As such,

Plaintiffs claim that "the DOC's reliance upon its own regulation was unlawful, where, as here,

that regulation operated contrary to the statute." (Pls.' Mem. at 45.)

In opposing Plaintiffs' argument, the Government contends that Commerce's regulation

is consistent with the Capping Provision, and the regulation conforms to the statute under which

the regulation was promulgated because that statute provides for the correction of ministerial

errors only in final determinations, and is thus silent with respect to amending a preliminary

determination to correct ministerial errors. <u>See</u> 19 C.F.R. § 351.224(e)[26]

---

difference between a weighted-average dumping margin . . . of zero (or <u>de</u> <u>minimis</u>) and a weighted-average dumping margin . . . of greater than <u>de</u> <u>minimis</u>, or vice versa." 19 C.F.R. § 351.224(g).

[26]     Subsection 1673d(e) of title 19 provides:

The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors. As used in this subsection, the term "ministerial errors" includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.

The court agrees with the Government. Commerce's regulation is entitled to receive deference under the Chevron doctrine. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984). Second, the regulation is not in conflict with the Capping Provision because that statute merely directs how the deposit rate should be used, not how it should be calculated.

The Supreme Court has held that where an agency puts forth an interpretation of a statute that is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843; see also Christensen v. Harris County, 529 U.S. 576, 586–87 (2000) (citing Chevron, 467 U.S. at 842–44) ("In Chevron, we held that a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute."). As such, "administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority," United States v. Mead Corp., 533 U.S. 218, 226–27 (2001), and the regulation was subject to a "relatively formal administrative procedure . . . ."[27] Id. at 230.

---

19 U.S.C. § 1673d(e).

[27]     Commerce revised its regulations on antidumping and countervailing duties to conform them to the Uruguay Round Agreements Act. Part 351 of the Code of Federal Regulations replaced former parts 533 and 535. Commerce published the following notices as a part of its rulemaking activity and received over five hundred written public comments: Advance Notice of Proposed Rulemaking and Request for Public Comments (Antidumping

Here, the regulation was promulgated pursuant to Congressional authority.  Further, it is a

permissible interpretation of the interpreted statute.  In the preamble to the proposed regulation,

Commerce stated:

> In establishing [the significant ministerial error] standard, which,
> as a matter of administrative practice, the Department has applied
> successfully for several years, the Department had to balance the
> competing interests of accurate preliminary determinations and the
> need to complete the investigation in a timely manner.  The
> Department has determined that the current standard allows it to
> correct the most serious errors promptly, while also permitting it to
> complete verification and issue a timely final determination.

Antidumping Duties: Countervailing Duties; Proposed Rule, 61 Fed. Reg. 7,308, 7,321 (Feb. 27,

1996).  In fulfilling its responsibility to "establish procedures for the correction of ministerial

errors in final determinations," 19 U.S.C. §1673d(e), it is surely a permissible construction of the

statute for Commerce to begin the process in the context of a preliminary determination and take

---

Duties; Countervailing Duties; Article 1904 of the North America Free Trade Agreement), 60
Fed. Reg. 80 (Jan. 3, 1995); Advance Notice of Proposed Rulemaking: Extension of Comment
Period (Antidumping Duties; Countervailing Duties; Article 1904 of the North America Free
Trade Agreement), 60 Fed. Reg. 9,802 (Feb. 22, 1995); Interim Regulations; Request for
Comments (Antidumping and Countervailing Duties), 60 Fed. Reg. 25,130 (May 11, 1995); (4)
Proposed Rule; Request for Comments (Antidumping and Countervailing Duty Proceedings;
Administrative Protective Order Procedures; Procedures for Imposing Sanctions for Violation of
a Protective Order), 61 Fed. Reg. 4,826 (Feb. 8, 1996); Notice of Proposed Rulemaking and
Request for Public Comments (Antidumping Duties; Countervailing Duties), 61 Fed. Reg. 7,308
(Feb. 27, 1996); Extension of Deadline to File Public Comments on Proposed Antidumping and
Countervailing Duty Regulations and Announcement of Public Hearing (Antidumping Duties;
Countervailing Duties), 61 Fed. Reg. 18,122 (Apr. 24, 1996); Announcement of Opportunity to
File Public Comments on the Public Hearing of Proposed Antidumping and Countervailing Duty
Regulations (Antidumping Duties; Countervailing Duties), 61 Fed. Reg. 28,821 (June 6, 1996);
Notice of Proposed Rulemaking and Request for Public Comments (Countervailing Duties), 62
Fed. Reg. 8,818 (Feb. 26, 1997); and Extension of Deadline to File Public Comments on
Proposed Countervailing Duty Regulations (Countervailing Duties), 62 Fed. Reg. 19,719 (Apr.
23, 1997).  See Final Rule, 62 Fed. Reg. 27,296 (May 19, 1997).  Commerce promulgated the
regulations contained in Part 351 pursuant to 5 U.S.C. § 301; 19 U.S.C. § 1202 note; 19 U.S.C. §
1303 note; 19 U.S.C. § 1671 et seq.; and 19 U.S.C. § 3538.

into account the considerations outlined above. This is particularly the case where the statute is entirely silent, and thus ambiguous, as to the correction of ministerial errors in a preliminary determination.

Nor is the regulation in conflict with the Capping Provision. The Capping Provision merely provides for a use to which the duty rates computed with the preliminary determination are to be put, without in any way stating how they should be determined. While it may be more advantageous to Plaintiffs for the deposit, and hence their ultimate liability, to be less, this result is not mandated by statute. Thus, the policy found in Commerce's regulation is in accordance with law.

## CONCLUSION

Based on the reasons set forth above, the court remands this matter to Commerce, so that it may conduct further proceedings consistent with this opinion. Such remand results are due within ninety days from the date of this opinion. Plaintiff shall have thirty days thereafter within which to file comments and Commerce may reply to any such comments within eleven days of their filing.

_____
Richard K. Eaton

Dated: June 18, 2002
New York, New York